[No. A102518. First Dist., Div. Four. May 14, 2004.]

CITY OF MORGAN HILL et al., Plaintiffs and Appellants, v.
BAY AREA AIR QUALITY MANAGEMENT DISTRICT et al., Defendants
and Respondents;
CALPINE INCORPORATED, Real Party in Interest and Respondent;
CALIFORNIA ENERGY RESOURCES CONSERVATION AND
DEVELOPMENT COMMISSION, Intervener and Respondent.

862

## COUNSEL

Law Offices of Stephan C. Volker, Stephan C. Volker, Gretchen E. Dent and Joshua A. H. Harris for Plaintiffs and Appellants.

Brian C. Bunger and Alexander G. Crockett for Defendants and Respondents.

Ellison, Schneider & Harris, Jeffery D. Harris and Christopher T. Ellison for Real Party in Interest and Respondent.

William M. Chamberlain, Richard C. Ratliff and Kerry Willis for Intervener and Respondent.

## OPINION

**REARDON, J.**—One who would construct and operate a California power plant must first obtain an interconnected set of federal, state and regional agency approvals. In this case, the City of Morgan Hill and others[1] oppose approval of a natural gas power plant, arguing that the project fails to comply with the California Environmental Quality Act (CEQA). (See Pub. Resources Code,[2] §§ 21000–21177.) An official of respondent Bay Area Air Quality Management District (District)—a regional agency charged to implement the federal Clean Air Act—issued a prevention of significant deterioration (PSD) permit for the power plant. (See 42 U.S.C. §§ 7401–7671q.) After the power plant was also certified by respondent California Energy Resources Conservation and Development Commission (Commission), the District's hearing board (Board) dismissed the City's administrative appeal of the District official's decision to issue the permit.

Turning to the courts, the City filed a petition for writ of mandate challenging the Board's dismissal of its appeal and the District official's

---

[1] The City of Morgan Hill and three nonprofit public benefit corporations—Santa Teresa *Citizen Action Group, Inc., Demand Clean Air, Inc.,* and Californians for Renewable Energy, Inc.—are the appellants in this matter. For convenience, we refer to them collectively as the City.

[2] All statutory references are to the Public Resources Code unless otherwise indicated.

issuance of the underlying permit. The trial court sustained demurrers to the petition without leave to amend on alternative state and federal grounds. On appeal from the trial court's subsequent order dismissing its petition for writ of mandate,[3] the City argues inter alia that the District violated CEQA when it approved the PSD permit. As we find that the trial court properly sustained the demurrers, we affirm its order dismissing the petition for writ of mandate.

## I. FACTS[4]

In April 1999, respondent Calpine Incorporated[5] sought a certificate from the Commission to construct and operate the Metcalf Energy Center, a 600-megawatt natural gas-fired power plant proposed to be built in San Jose.[6] (See *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 697 [7 Cal.Rptr.3d 868].) In May 1999, Calpine also sought a PSD permit from respondent Air Pollution Control Officer (APCO)—an official of the District—to establish that the power plant satisfied federal Clean Air Act standards intended to prevent the significant deterioration of air quality. (See 42 U.S.C. §§ 7470–7479; see also 40 C.F.R. § 51.166 (2003).)

In October 2000, the Commission issued its final staff assessment (FSA) of Calpine's application for a power plant certificate. In February 2001, the Governor issued an executive order requiring local, regional and state agencies making CEQA decisions on power plant proposals to use the Commission FSA in the same manner as it would use an environmental impact report (EIR) prepared by a lead agency. (See Governor's Exec. Order No. D-26-01 (Feb. 8, 2001) (Executive Order No. D-26-01).) In May 2001, the District's APCO issued a PSD permit for the proposed Metcalf Energy Center, relying on the FSA as the functional equivalent of an EIR. (See Health & Saf. Code, §§ 40750–40753.)

---

[3] The City filed a timely notice of appeal from the judgment. As an order sustaining a demurrer is not an appealable order, we dismissed this appeal in January 2004. (*City of Morgan Hill v. Bay Area Air Quality Management District* (Jan. 8, 2004, A102518) [nonpub. opn.]; see *Beazell v. Schrader* (1963) 59 Cal.2d 577, 579–580 [30 Cal.Rptr. 534, 381 P.2d 390]; see also 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 113, pp. 178–179.) However, the order dismissing a complaint with prejudice constitutes an appealable judgment, allowing us to review the issues presented in this appeal. (See Code Civ. Proc., §§ 581d, 904.1, subd. (a)(1).) As such, we granted the City's petition for rehearing.

[4] In October 2003, we granted two requests for judicial notice—one filed by the City and one by the Commission and the District—without a determination of relevance. We find that the documents submitted by both parties are relevant to our determination.

[5] At one time Bechtel Corporation was also a partial owner of the power plant project, but apparently it transferred all of its interests in the project to Calpine.

[6] At the time of the Commission's decision, part of the project site was located in San Jose and part was located on Santa Clara County land. In June 2001, it appears that the City of San Jose decided to annex the project site.

In June 2001, the City filed an administrative appeal of the APCO decision to issue the PSD permit to the Board. The City alleged that the permit failed to comply with CEQA and District regulations implementing that statute. (See Health & Saf. Code, §§ 40800–40865, 42302.1.) The City also filed a PSD permit appeal with the federal Environmental Appeals Board (EAB). In August 2001, the EAB denied review of the PSD permit. In doing so, it specifically declined to rule on state law issues such as CEQA compliance on jurisdictional grounds. On these nonfederal matters, the EAB held that the petitioners' "redress is in another forum."[7]

In September 2001, the Commission granted a certificate to construct and operate the Metcalf Energy Center power plant.[8] It identified itself as the lead agency for purposes of CEQA and stated that the documents associated with the certification process constituted the functional equivalent of an EIR. (See §§ 21165, 25519, subd. (c).) The Commission required many conditions of certification, including 55 conditions relating to air quality—47 of those as required by the District as a condition of its PSD permit.

After issuing the certificate, the Commission appeared as amicus curiae before the Board in the City's appeal of the PSD permit, arguing that its authority preempted the District's jurisdiction. In December 2001, the Board dismissed the City's appeal, finding that it had no subject matter jurisdiction over any PSD permit issues because federal law required them to be resolved by the EAB. It also concluded that the EAB's August 2001 decision was a proper and full adjudication of the issues properly before that body. To the extent that state law issues were involved, the Board found that it had no authority to review, override or overturn conditions imposed on a project by the Commission. In March 2002, the Board denied the City's motion for reconsideration of its decision dismissing the City's appeal.[9] (See Health & Saf. Code, § 40861.)

---

[7] In November 2002, the United States Court of Appeals for the Ninth Circuit upheld the EAB decision denying review of the PSD permit issued by the District. The Ninth Circuit specifically held that the EAB properly concluded that any CEQA issues were matters of state law that were inapplicable to the federal PSD permit.

[8] The Commission certificate is not at issue in this appeal. Judicial review of a Commission certificate is made directly to the California Supreme Court. (See § 25531, subd. (a).) The California Supreme Court denied a petition challenging that certificate without opinion in February 2002. See *Santa Teresa Citizen Action Group v. State Energy Resources Conservation & Development Com.* (2003) 105 Cal.App.4th 1441, 1444–1451 [130 Cal.Rptr.2d 392], [upholding constitutionality of statute giving California Supreme Court exclusive jurisdiction *to review Commission power plant certificates*].)

[9] In February 2002, the District issued the power plant's authority to construct. An authority to construct letter may not be issued until after the Commission issues its certificate and the

In September 2002, the City petitioned for a writ of mandate in the trial court, challenging the APCO and Board decisions. (See Code Civ. Proc., § 1085, subd. (a).) Calpine was named as a real party in interest and the Commission intervened in the action. The City filed its first amended petition in November 2002. In it, the City sought to set aside the PSD permit, to vacate the Board's denial of its appeal, and to overturn the Board's decision denying reconsideration of that denial. The District, the Commission and Calpine demurred to the City's first amended petition, arguing inter alia that the trial court had no subject matter jurisdiction in the case.

The trial court issued a tentative decision to overrule the demurrers and held a hearing on the matter. In March 2003, the trial court sustained the demurrers on two grounds. First, it found that the Commission had conducted all required CEQA review. The fact that the PSD permit was issued in May 2001 before the Commission issued its certificate in September 2001 was held to be irrelevant. Alternatively, the trial court found that the PSD permit was a federal permit that did not require any state CEQA review. It sustained the demurrers without leave to amend and dismissed the first amended petition with prejudice.

## II. STANDARD OF REVIEW

█ Before we address the merits of this case, we review the standard of review that we apply when doing so. It is well established that a demurrer tests the legal sufficiency of the complaint. (*Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1497 [57 Cal.Rptr.2d 406]; *Sargoy v. Resolution Trust Corp.* (1992) 8 Cal.App.4th 1039, 1041 [10 Cal.Rptr.2d 889].) On appeal from a dismissal entered after an order sustaining a demurrer, we review the order de novo, exercising our independent judgment about whether the petition states a cause of action as a matter of law. (See *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479], cert. den. 499 U.S. 936 [113 L.Ed.2d 444, 111 S.Ct. 1388]; *Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110, 1115 [55 Cal.Rptr.2d 276].) We give the petition a reasonable interpretation, reading it as a whole and viewing its parts in context. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; see *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) We deem to be true all material facts that were properly pled. (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241].) We must also accept as true those facts that may be implied or inferred from those expressly alleged. (*Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403 [44 Cal.Rptr.2d 339].) We may also

---

APCO determines that the certificate contains all applicable conditions. (See Dist. reg. 2, rule 2-3-405.)

consider matters that may be judicially noticed, but do not accept contentions, deductions or conclusions of fact or law. (*Serrano v. Priest, supra,* 5 Cal.3d at p. 591.)

■ If the petitioner has stated a cause of action under any possible legal theory, we will order that the demurrer be overruled. (See *Aubry v. Tri-City Hospital Dist., supra,* 2 Cal.4th at pp. 966–967.) However, if no liability exists as a matter of law, we affirm the trial court's order sustaining the demurrer. (See *Baughman v. State of California* (1995) 38 Cal.App.4th 182, 187 [45 Cal.Rptr.2d 82].) We independently construe statutory law, as its interpretation is a question of law on which we are not bound by the trial court's analysis. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856]; see *Baughman v. State of California, supra,* 38 Cal.App.4th at p. 187.)

With this standard of review in mind, we turn to the merits of the issues raised in the City's appeal. As an appellate court, we generally review the trial court's ruling, not the reasons it gave for that ruling. (See *Jackson v. Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830, 1836 [20 Cal.Rptr.2d 913]; *McCorkle v. State Farm Ins. Co.* (1990) 221 Cal.App.3d 610, 615, fn. 2 [270 Cal.Rptr. 492].) However, because of the complexity of the issues involved in this matter, we deem it prudent to consider first whether the trial court's reasons for its ruling were correct. The trial court sustained the demurrer on two alternative grounds: on federal grounds—because the District's approval of the federal PSD permit did not require CEQA compliance—and on state grounds—because the District properly relied on the Commission's FSA and thus satisfied all environmental review requirements. We will consider these bases of the trial court's ruling in turn.[10]

## III. FEDERAL GROUNDS

### A. *Federal PSD Permit*

On appeal, the City contends that the District violated CEQA, statewide CEQA guidelines, its own CEQA regulations and the federal delegation agreement when it issued the PSD permit without first obtaining an EIR or its functional equivalent. It argues that the District, acting under a delegation agreement from the United States Environmental Protection Agency (EPA), was required by the terms of that agreement to comply with CEQA[11] and the

---

[10] At the City's request, we set this appeal for hearing on our first available calendar. (See §§ 15, 21167.6, subd. (i).)

[11] The City does not argue that the permit violates the National Environmental Policy Act (NEPA)—the federal equivalent of CEQA. By federal law, PSD permit decisions are exempt from the environmental impact statement requirements of NEPA. (15 U.S.C. § 793(c)(1);

District's CEQA regulations. The trial court disagreed with this reasoning, concluding that the PSD permit was a federal permit that did not require CEQA compliance. Thus, our first task is to determine whether CEQA applies to the PSD permit at all.

■ To resolve this question, we must understand the District's federal functions. The District is a local air quality management district that regulates and controls stationary sources of air pollution in nine counties—including Santa Clara County—surrounding the San Francisco Bay. (See Health & Saf. Code, §§ 40000–40001, 40200–40276; see also Gov. Code, § 23143.) The District assists in the administration of the Clean Air Act—a federal statute establishing a combined federal and state program to control air pollution. (See *Greater Detroit Res. Recovery Auth. v. U.S. E.P.A.* (6th Cir. 1990) 916 F.2d 317, 320 (*Greater Detroit*); see also 42 U.S.C. §§ 7470–7479.) At all times relevant to this matter, the District was charged with implementing the federal PSD program in order to prevent the significant deterioration of air quality within its jurisdiction. (See 42 U.S.C. §§ 7471, 7475(a); 40 C.F.R. § 52.21(u) (2003).) When the District's APCO issued the PSD permit for the Metcalf Energy Center, the EPA had formally delegated its authority to issue PSD permits pursuant to the Clean Air Act to the District.[12] In such circumstances, the District issues the PSD permit as a federal permit on behalf of the EPA. (*Greater Detroit, supra,* 916 F.2d at pp. 320–321; 42 U.S.C. § 7410(c)(3); 40 C.F.R. §§ 52.21(u) (2003), 124.41; see 45 Fed.Reg. 33413 (May 19, 1980).) Thus, the PSD permit issued by the District was a federal permit.

B. *Delegation Agreement*

Ordinarily, the conclusion that the PSD permit is a federal one would seem to preclude application of any state law such as CEQA. The District issued the permit acting on behalf of federal authorities who are not bound by state law. (See U.S. Const., art. VI, § 2.) However, the City argues that the language of the delegation agreement between the EPA and the District requires that its CEQA regulations be applied in the context of PSD permits issued by the District in the administration of the Clean Air Act. In essence,

---

40 C.F.R. § 124.9(b)(6) (2003); *In re Knauf Fiber Glass* (U.S. Environmental Protection Agency, 1999) 8 E.A.D. 121, 171; see 42 U.S.C. §§ 4321–4370f.)

[12] The delegation agreement was rescinded on March 3, 2003, when a significant revision to title 40 Code of Federal Regulations part 52.21(u) took effect. The District had advised the EPA that California law did not allow District officials to implement the revised version of this federal regulation. (See 68 Fed.Reg. 19371–19372 (Apr. 21, 2003).) At all times relevant to the matter before us, the District held the authority to issue the federal PSD permits.

the City argues that the delegation agreement incorporates the District's CEQA regulations by reference, giving those regional regulations the force of federal law.

In its delegation agreement with the District, the EPA determined that the PSD portion of District regulation 2, rule 2 generally meets the federal PSD regulation requirements. The agreement provides that District permits must meet the requirements of that regulation. (See 40 C.F.R. §§ 51.165, 51.166, § 52.21(u) (2003).) One part of District regulation 2, rule 2 requires that if the District is not the lead agency under CEQA, then the District must receive a copy of the EIR or its functional equivalent from the lead agency *before* it issues the District permit. (Dist. reg. 2, rules 2-2-401, 2-2-401.3, 2-1-426.) The City complains that in this matter, the District violated this regulation by issuing its PSD permit before receiving the Commission's final decision in September 2001. Thus, the City reasons that the District did not comply with its own CEQA regulations as required by delegation agreement, making issuance of the PSD permit unlawful.

In order to prevail, we must accept a series of assumptions that the City urges on us—that the federal delegation agreement requires compliance with District regulation 2, rule 2 before the District may issue a federal PSD permit and that the regulation which the City contends was violated by the District was part of the PSD portion of this regulation. Each of these claims is vigorously contested by the District, the Commission and Calpine.[13] Even if we assume arguendo that the City could establish these necessary predicates to its claim for relief, the City must also overcome another hurdle—that the federal authorities charged with enforcing the regulation it asserts is required by a federal delegation agreement do not deem the issues raised to be within federal jurisdiction.

## C. *Federal Review*

■ Federal law and the delegation agreement itself specifically provides that the District PSD permit is subject to review only before the EAB and the federal Court of Appeals for the Ninth Circuit. (See 42 U.S.C. § 7607(b)(1);

---

[13] Calpine asks us to take judicial notice of the "many occasions" when the EPA has issued PSD permits without issuance of a CEQA document. However, Calpine neglects to cite us to evidence of one of these instances and, as it is unclear whether this evidence would be relevant in the context of the specific delegation agreement before us, we decline its invitation. (See Evid. Code, §§ 453, subd. (b) [party's obligation to furnish court with sufficient information to enable it to take judicial notice], 459, subd. (a) [judicial notice in reviewing court].)

40 C.F.R. § 124.19(a) (2003); see also *Greater Detroit, supra,* 916 F.2d at p. 321.) Authorities issuing PSD permits pursuant to a delegation agreement with the EPA sometimes include permit conditions pertaining to both federal and state law. The inclusion of state or local requirements in a PSD permit is legitimate, because it consolidates all relevant requirements into one document and obviates the need to acquire separate federal, state and regional permits. However, when called on to review a PSD permit, the EAB will not assume jurisdiction over any state law claims. It reviews only the federal aspects of a PSD permit—only those issues that are explicit requirements of relevant federal statutes or regulations. (*In re Knauf Fiber Glass, supra,* 8 E.A.D. at pp. 161–162, 171 [CEQA requirements as state law, separate from federal PSD review]; see *In re West Suburban Recycling and Energy Center* (U.S. EPA, 1996) 6 E.A.D. 692, 704 [scope of EAB review limited to federal PSD issues when permit proceeding involves both state and federal law requirements]; see also *In re Sutter Power Plant* (U.S. EPA, 1999) 8 E.A.D. 680, 690 [no EAB review in PSD appeal of state agency decisions].) Thus, the PSD review process in federal court does not necessarily consider every environmental issue raised by a proposed project, even if that issue is related to air quality. (*In re Sutter Power Plant, supra,* 8 E.A.D. at p. 688.)

■ In such permits, any state or regional issues are left to state officials to determine through other regulatory programs that address those nonfederal issues. (See *In re Knauf Fiber Glass, supra,* 8 E.A.D. at p. 162.) The EAB has specifically held that issues pertaining to CEQA are state law requirements that are separate from federal PSD review. (See, e.g., *id.* at p. 171.) In power plant siting cases, the Commission is acknowledged as the primary state authority on environmental issues. (§ 25500; see *In re Sutter Power Plant, supra,* 8 E.A.D. at p. 689 [EPA acknowledges that Commission is key state authority in such cases].) Thus, it is conceivable that a PSD permit might issue, that federal authorities might find no fault with the federal aspects of the permit, and that state issues might remain for resolution by a state court.

■ The jurisdiction of the EAB to review PSD permits extends only to those issues directly related to permit conditions implementing the federal PSD program. All other issues fall outside its jurisdiction. When determining the extent of its jurisdiction, the EAB relies to a considerable extent on how the issue is framed in the petition for review, such as the basis on which relief is sought. (*In re Knauf Fiber Glass, supra,* 8 E.A.D. at pp. 161–162; see *In re Sutter Power Plant, supra,* 8 E.A.D. at p. 688, fn. 10.) In this matter, the City

argues three bases of relief—violation of CEQA statewide guidelines, violation of the District's CEQA regulations, and violation of the delegation agreement between the EPA and the District. Only the City's claim founded on violation of the delegation agreement could fall within the EAB's jurisdiction. (See *ibid.*)

To the extent that the City's argument turns on its claim that the District violated the federal delegation agreement by failing to comply with its CEQA regulation,[14] the issue would be one for federal authorities. The EAB declined to consider the CEQA claim, ruling that this involved matters within state court jurisdiction. The Ninth Circuit denied review of its order, specifically finding that the EAB properly concluded that CEQA compliance was a state law issue that was not a proper part of EAB review of the PSD permit. Thus, those federal authorities responsible for the oversight of the federal PSD permit at issue in this matter do not appear to regard compliance with CEQA—even if required by the federal EPA's delegation agreement—as a matter for federal enforcement. Instead, they view CEQA compliance as purely a state law issue. As those federal authorities charged with the responsibility to enforce federal law—and, by implication, the federal delegation agreement on which the City relies—appear to have rejected this argued basis for the City's claim, we find no merit in it. As such, we conclude that the trial court properly dismissed the petition for writ of mandate after sustaining the demurrers without leave to amend on federal grounds.

## IV. STATE GROUNDS

### A. *CEQA Requirements*

■ To the extent that the City's argument turns on a claim that the District violated its own CEQA regulations or CEQA statewide guidelines, then the disputed issue would fall within state jurisdiction. In this matter, two agencies—the District and the Commission—were reviewing Calpine's plans to construct and operate the Metcalf Energy Center. Under statewide CEQA guidelines, when an environmental analysis document is prepared for

---

[14] The City also asserts that the District failed to comply with CEQA—an assertion that appears to be built on its claim that it was required to and failed to comply with its own CEQA regulation. As we have rejected the predicate argument, we also necessarily reject the broader claim that CEQA applies to this federal PSD permit.

a project under a certified program, it must be used by any other agency granting an approval for the same project if the certified agency is the first to grant a discretionary approval for the project. (Cal. Code Regs., tit. 14, § 15253, subds. (a)–(b)(1).) The power plant certification process administered by the Commission constituted a certified program. (Cal. Code Regs., tit. 14, § 15251, subd. (k).)

■ State law requires the Commission to undertake CEQA review as part of its certification process. (§ 25519, subd. (c).) When the Commission, as part of its certification process, requires written documentation containing environmental information and complying with other CEQA requirements, that documentation may be submitted in lieu of an EIR. (§ 21080.5, subd. (a); see Cal. Code Regs., tit. 14, § 15250.) In this matter, the Commission was designated as the lead agency for purposes of CEQA. Its October 2000 FSA was stated to constitute the environmental document in lieu of an EIR. (See §§ 21165, 25519, subd. (c).)

■ When the District is not the lead agency under CEQA, statewide CEQA guidelines[15] and the District's own regulations[16] also require the District to issue its permit only *after* the lead agency has issued its final approval. (See Cal. Code Regs., tit. 14, § 15253, subds. (a)–(b)(1); Dist. reg. 2, rules 2-2-401, 2-1-426.2.) As the District issued its PSD permit in May

---

[15] "(a) An environmental analysis document prepared for a project under a certified program [such as the Commission's power plant certification program] shall be used by another agency granting an approval for the same project where the conditions in Subsection (b) have been met. In this situation, the certified agency shall act as lead agency, and the other permitting agencies shall act as responsible agencies using the certified·agency's document. [¶] (b) The conditions under which a public agency shall act as a responsible agency when approving a project using an environmental analysis document prepared under a certified program in the place of an EIR . . . are as follows: [¶] (1) The certified agency is the first agency to grant a discretionary approval for the project." (Cal. Code Regs., tit. 14, § 15253, subds. (a)–(b)(1); see Cal. Code Regs., tit. 14, § 15251, subd. (k).)

[16] "[A]pplications for authorities to construct facilities subject to Rule 2 shall include . . . [¶] . . . [¶] 401.3. CEQA-related information which satisfies the requirements of Regulation 2-1-426." (Dist. reg. 2, rules 2-2-401, 2-2-401.3.) That regulation provides: "When an agency other than the District is to be the Lead Agency under CEQA, [the applicant must provide as part of its complete application] either: [¶] 2.1. A Draft or Final Environmental Impact Report prepared by or under the supervision of the Lead Agency; or [¶] 2.2. A contract for the preparation of a Draft Environmental Impact Report executed by the Lead Agency . . . ; or [¶] 2.3. A Negative Declaration prepared by the Lead Agency; or [¶] 2.4. A Notice of Preparation of a Draft EIR prepared by the Lead Agency; or [¶] 2.5. A copy of the Initial Study prepared by the Lead Agency[;] or [¶] 2.6. A commitment in writing from another agency indicating that it has assumed the role of Lead Agency for the project in question." (Dist. reg. 2, rule 2-1-426.)

2001 *before* the Commission—acting as lead agency—issued its September 2001 certificate, the District was not permitted to use the Commission's environmental document. Thus, the City reasons that the District violated its own rules and, by inference, the delegation agreement from the EPA when it issued the PSD permit.

In other times, the City might prevail. However, at the time that the District issued the PSD permit, California was in the midst of a state of emergency on electricity. For this reason, the trial court disagreed with the City's argument, applied an executive order countermanding these state and regional provisions, and concluded that all required environmental review had occurred. Our understanding of this ruling turns on the temporary revocation of the state and regional CEQA regulations resulting from Executive Order D-26-01.

B. *Executive Order No. D-26-01*

On January 17, 2001, Governor Gray Davis proclaimed a state of emergency existed as a result of California's electricity shortage. (Governor's Proclamation of State of Emergency (Jan. 17, 2001); see Exec. Order No. D-26-01.) This proclamation was issued pursuant to the state Emergency Services Act. (See Gov. Code, §§ 8550–8668; see also Exec. Order No. D-26-01.) That enactment authorizes the Governor to *rescind* regulatory statutes and regulations, if this action is necessary to carry out the provisions of the act. (§§ 8567, subd. (a), 8571.)

In February 2001, Governor Davis issued an executive order pursuant to the state Emergency Services Act. In it, he ordered that any agency that must "make a decision subject to" CEQA related to a proposed power plant "shall use the final staff report prepared for public hearings in the Energy Commission's [certification] process in the same manner as the agency would use an environmental impact report prepared by a lead agency" unless the Commission determines that another document would be more appropriate for this use for the power plant under consideration. (See Exec. Order No. D-26-01.)

Applying the executive order, in May 2001 when the PSD permit issued, the District was required to use the FSA as the CEQA environ-qjmental document—the functional equivalent of an EIR. (See Exec. Order No. D-26-01; see also Cal. Code Regs., tit. 20, §§ 1741, subds. (a), (b)(1), 1742, subds. (b), (c), 1742.5, subd. (b), 1747.) The City raises various arguments challenging this conclusion. First, it contends that the FSA was not an adequate functional equivalent of an EIR, citing CEQA statutes and statewide CEQA guidelines in support of this claim. (See §§ 21002, 21002.1, subd. (b),

21003.1, 21005, subd. (a), 21081; Cal. Code Regs., tit. 14, §§ 15091, 15096, subds. (g)–(h), 15126, subd. (a), 15126.6, 15250, 15251, subd. (k), 15253, subds. (b)–(c); Cal. Code Regs., tit. 20, §§ 1742.5–1744.) However, to the extent that they were inconsistent with the Governor's Executive Order, those state regulations were effectively repealed from February 8 until December 31, 2001, by that order. (See Exec. Order No. D-26-01.)

Second, the City challenges the interpretation of the executive order, urging us to conclude that it was intended to clarify only one aspect of the statewide CEQA guidelines, allowing the District to use the FSA as the environmental document only if other criteria set forth in the statewide CEQA guidelines were also met. (See Cal. Code Regs., tit. 14, § 15253.) The order provides that an agency that must make a CEQA decision on a power plant proposal must use the Commission's FSA "in the same manner" as that agency would use an EIR. (See Exec. Order No. D-26-01.) The City reasons that the language "in the same manner" means that the District could use the FSA as it would an EIR, but argues that the executive order did not relieve the District of the obligation to comply with CEQA guidelines requiring it to wait to issue its PSD permit until the lead agency—the Commission—had issued its certificate. (See Cal. Code Regs., tit. 14, § 15253, subd. (b)(1).) Under its interpretation, the key environmental document remained the Commission certificate, not the final assessment issued many months earlier by its staff.

██ The construction of an executive order presents an issue akin to an issue of statutory interpretation—one that presumably presents a question of law for our independent review on appeal. (See *California Teachers Assn. v. San Diego Community College Dist., supra,* 28 Cal.3d at p. 699; see also *Da Vinci Group v. San Francisco Residential Rent etc. Bd.* (1992) 5 Cal.App.4th 24, 28 [6 Cal.Rptr.2d 461] [ordinance construed as statute would be].) When construing this provision, we read the words of the executive order to determine its purpose. We seek to interpret it in a manner that promotes wise policy, not absurdity. We avoid an interpretation that would render terms surplusage, but seek to give every word some significance, leaving no part useless or devoid of meaning. (*Bonnell v. Medical Bd. of California* (2003) 31 Cal.4th 1255, 1260–1261 [8 Cal.Rptr.3d 532, 82 P.3d 740]; *City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 54 [184 Cal.Rptr. 713, 648 P.2d 935]; *McLaughlin v. State Bd. of Education* (1999) 75 Cal.App.4th 196, 210–211 [89 Cal.Rptr.2d 295]; *AFL-CIO v. Deukmejian* (1989) 212 Cal.App.3d 425, 435 [260 Cal.Rptr. 479].)

. To adopt the City's interpretation of the executive order would be absurd, rendering the order a virtual nullity. The purpose of this order was to alleviate a growing electricity shortage that threatened California's residents and commercial users of energy. The order was intended to expedite the processing of applications for power plants by ensuring that the necessary environmental review of such proposals would be completed more quickly. It designated the FSA, not the later-issued Commission certificate, as the functional equivalent of an EIR for power plant proposal applications for all state and regional agencies. The City's interpretation would countermand the executive order, rather than uphold it. The language of the order is clear and we will follow its plain meaning. (See *Great Lakes Properties, Inc. v. City of El Segundo* (1977) 19 Cal.3d 152, 155 [137 Cal.Rptr. 154, 561 P.2d 244].)

From February 8 through December 31, 2001, the Commission's FSA was designated as the environmental document for all state and regional agencies, including the District. (See Exec. Order No. D-26-01.) In this matter, the District relied on the FSA issued by the Commission staff in October 2000—before its PSD permit issued in May 2001—as the environmental document in this matter. Thus, the pivotal event was not the September 2001 issuance of the Commission certificate but the October 2000 issuance of its staff's final assessment of the environmental impact of the Metcalf Energy Center.[17]

C. *Commission Review*

 Having concluded that the executive order repealed any contrary CEQA guidelines and District regulations that might otherwise apply to the PSD permit application, we then turn to our final question—whether the District's environmental review was sufficient. The trial court held that all required CEQA environmental review had occurred as part of the Commission's certification process. Our review of the City's challenge to this conclusion of the trial court requires us to consider the Commission's broad authority.

---

[17] The City raises several other challenges to the applicability of the executive order, none of which have merit. Only one warrants mention—the City's assertion that because the executive order expired in December 2001 before the Board's March 2002 final decision denying its appeal of PSD permit, the order was no longer in effect. The petition for writ of mandate seeks to overturn the May 2001 APCO decision to issue the permit, the December 2001 Board denial of its appeal of that permit decision, and the March 2002 Board denial of its request for reconsideration. As the key underlying events—the PSD permit and the Board appeal—occurred before the executive order expired, this argument is not persuasive.

The Legislature has given the Commission exclusive power to certify a site for a new power plant. (§§ 25104, 25500.) Its certification of the site of a power plant is, by state law, in lieu of any permit, certificate or similar document required by any local or regional agency.[18] This statute supersedes all statutes, ordinances and regulations of those state, local or regional agencies. (§ 25500.) The Commission does not prepare an EIR as part of its certification process. The power plant siting program is certified by the State Resources Agency as exempt from CEQA's EIR requirement. (§ 21080.5, subd. (a); see Cal. Code Regs., tit. 14, §§ 15250, 15251, subd. (k).)

The Commission certificate constitutes the only *state, local or regional* approval necessary to construct and operate a power plant. (§ 25500.) The PSD permit is a *federal* approval issued by the District. (See pt. III.A., *ante.*) The Commission and the District work together in their approval process. The Commission must obtain a determination of compliance from the District as part of its own air quality assessment during the certification process. The District officer reports this determination to the Commission. (Cal. Code Regs., tit. 20, § 1744.5, subd. (b); see Dist. reg., rule 2-3-403.) A representative of the District appears at Commission hearings to present and explain that determination. (See Cal. Code Regs., tit. 20, §§ 1744.5, subd. (c), 1748.)

 In this matter, the Commission's October 2000 FSA conducted as part of its certification process constituted the environmental document needed before the District could issue its May 2001 PSD permit. The Commission's September 2001 certificate—incorporating the earlier assessment of its staff—was the only CEQA approval that the project required. (See § 25500.) To the extent that the City sets forth a state claim of error related to the District's issuance of the federal PSD permit, the Commission conducted any and all required environmental review of the project during its certification process. Thus, the trial court properly dismissed the petition for writ of mandate after properly sustaining the demurrers without leave to amend on state grounds.

## V. REMITTITUR

Even if we assume many of the contentions that the City argues are true for purposes of argument, it still cannot prevail on its petition for writ of mandate. The District's PSD permit is federal in nature, making CEQA inapplicable. To the extent that the City's petition for writ of mandate is an effort to enforce a federal delegation agreement, federal authorities have

---

[18] When it issued its certificate in September 2001, the Commission found that the Metcalf Energy Center project would not create significant direct or cumulative adverse environmental impacts.

already declined to accept jurisdiction over these purported federal issues. To the extent that any state issues remain relating to the PSD permit that may properly be considered in a state forum, the Commission's certification process satisfies all required CEQA review. Thus, we find that the trial court properly sustained the demurrers without leave to amend on both state and federal grounds, and it correctly dismissed the petition for writ of mandate.[19]

The dismissal order is affirmed.

Kay, P. J., and Rivera, J., concurred.

---

[19] In light of this conclusion, we need not address the City's other contentions—that its motion for reconsideration of the Board's decision to deny its administrative appeal challenging the PSD permit tolled the statute of limitations under section 21167; and that a decision in a separate action against the Commission is res judicata for this action.