Filed 4/15/13Redln Enterprises v. City of San Diego CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| REDLN ENTERPRISES, INC. et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF SAN DIEGO et al., <br><br> Defendants and Respondents. | D060164 <br><br><br> (Super. Ct. No. 37-2009-00085820-CU-EI-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy Taylor , Judge.  Affirmed.

Appellants Redln Enterprises, Inc. and Daniel Kullberg, the president and majority shareholder of Redln (collectively Redln), appeal the successful demurrer of respondents City of San Diego (City) and William Zounes, a development project manager of the City (Zounes), to Redln's second amended complaint (SAC).  Redln contends the court erred when it found the SAC did not state facts sufficient to support claims for inverse condemnation or takings (first cause of action) and for violation of civil rights pursuant to

title 42 United States Code section 1983 (section 1983) for regulatory taking (second cause of action).[1] Redln also contends the court abused its discretion by not granting Redln leave to amend the SAC to state a new cause of action for selective enforcement. Affirmed.

## BACKGROUND

Because this is an appeal following a successful demurrer, we accept as true all facts properly pled in Redln's SAC, and also incorporate any facts judicially noticed.[2] (*Gu v. BMW of North America, LLC* (2005) 132 Cal.App.4th 195, 200.)

The SAC alleges that Redln, doing business as "All in One," obtained a business license from the City in 1997 to sell used cars wholesale to dealers on property generally located at 943-949A Heritage Road, San Diego (the property).  (SAC, ¶¶ 10, 12.)  Redln that same year received the required approval from the Department of Motor Vehicles (DMV) to operate this business.

The SAC further alleges that in July 1999, doing business as "Vehicle Storage Auction Pool" (VSAP), Redln obtained written approval from the City to operate a

---

[1]    We note from the record that Redln's complaint asserts four causes of action, including two additional causes of action based on section 1983 (e.g., third cause of action for unlawful policy/custom and fourth cause of action for failure to train employees).  On appeal, however, Redln challenges only the demurrer to its first and second causes of action.

[2]    Respondents' unopposed request for judicial notice of various sections of the San Diego Municipal Code (SDMC) is granted.

vehicle wholesale auction business on the property. (SAC, ¶¶ 13-15.) The following month, the DMV issued Redln an occupational vehicle dealer's wholesale license.

In 2005, personnel from the County of San Diego (County) suggested Redln submit a bid to provide auction services for the County. Redln, in turn, contacted the City and explained it needed different licenses than the ones it then possessed in order to sell equipment and vehicles directly to the public, as contemplated under a proposed agreement with the County. Redln was referred to Zounes.

The SAC alleges that in February 2006, Zounes responded to Redln on behalf of the City. Zounes advised Redln that its then present wholesale auction activity conducted by VSAP was *not* permitted by the zoning for the property as set forth in section 103.1103 of the SDMC and that Redln needed to obtain a conditional use permit (CUP) to operate that business. (SAC, ¶ 17.) Zounes also advised Redln that due to "sensitive vegetation" on portions of the property, Redln also was required to obtain a site development permit (SDP). In March 2006, the City's zoning project officer notified Redln that an auction facility was not a permitted use on the property because "it was not 'wholesaling.'" (SAC, ¶ 19.) Redln disputed it was required to obtain either permit.

Beginning in May 2006, Redln ceased conducting wholesale auctions on the property. (SAC, ¶ 20.) Redln "thereafter transported the vehicles it *periodically* had for sale" to another wholesale auction house located nearby. (*Ibid*., italics added.) Redln continued to sell used cars wholesale to dealers from the property.

The SAC alleges that in October 2007, City code enforcement coordinator Melody Negrete served Redln with a civil penalty and notice order (civil penalty order) "stating that [Redln] required a CUP and SDP . . . to operate the auto auction business, that the [p]roperty was no longer being used as an auto dismantling facility, and that the prior CUP had 'expired.'"  (SAC, ¶ 22.)  The civil penalty order also cited Redln for violating various provisions of the SDMC for unlawfully erecting and using buildings and structures without the proper permit and inspection approvals.  The civil penalty order gave Redln until November 9, 2007 to correct the violations.

The appeal of the civil penalty order commenced in January 2008 before administrative law judge Nancy Beardsley (ALJ).  After several days of testimony, the ALJ on May 10, 2008 issued a 19-page administrative enforcement order (enforcement order) ruling that Redln did not need a CUP but that it did need an SDP because according to the ALJ, Redln began operating its auction business after the new land development code requiring an SDP became effective on January 1, 2000.  The ALJ also ruled that Redln could stay on the property if it applied for an SDP by no later than August 31, 2008 and that until the SDP application was deemed complete and was approved by the City, Redln was not entitled to conduct any automobile *auctions* (as opposed to sales) from the property.

Alternatively, if Redln did not apply for an SDP within the appropriate time frame, the ALJ ruled Redln was to cease *all* business activities on, and clear and vacate all business operations from, the property.

4

Following the enforcement order, Redln sought clarification regarding whether All in One could continue its business operations on the property while VSAP applied for an SDP. The SAC alleges that the ALJ referred the matter to Zounes, who responded by letter on August 5, 2008 that Redln could not conduct any "development" on the property, as defined under the SDMC, until an SDP was approved.[3] (SAC, ¶ 31; Exh. 4 to SAC.) Redln alleged in the SAC on information and belief that SDP compliance could have taken up to two years and cost several hundred thousand dollars. As set forth in its SAC, based on Zounes's response Redln determined it could not conduct *any business* on the property while it sought an SDP.

Rather than move forward with an SDP application, Redln filed a writ of mandamus in the Superior Court, County of San Diego (case No. 37-2008-00089656-CU-WM-CTL; writ petition) and discontinued business operations on the property. The SAC alleges that the court subsequently granted Redln's motion to augment the administrative record to include auction receipts that predated January 1, 2000 and remanded the matter to the administrative hearing officer with instructions to hold a

_____

3    We note that in his August 5, 2008 letter stating Redln could not develop the property due to the presence of environmentally sensitive lands, Zounes referred to section 11**1**.0103 of the SDMC. However, this section refers to headings in the land development code and states that such headings "are inserted for convenience of reference only and do not define, describe, or limit the scope, meaning or intent of any provision" of said code. SDMC section 11**3**.0103 sets forth the definitions of terms used in the SDMC, including the definition of "development." It appears there was a typographical error in Zounes's letter and thus we will refer to SDMC section 113.0103 as the applicable section for purposes of this proceeding.

further evidentiary hearing regarding when Redln commenced business operations on the property. (SAC, ¶ 33.)

A further evidentiary hearing was held by the same ALJ in April 2010. The ALJ in June 2010 issued a supplemental findings of fact and determination of issues on remand (supplemental enforcement order), finding that Redln commenced business operations in September 1999 and therefore that an SDP was not needed.

Redln filed a complaint in March 2009 in the Superior Court, County of San Diego (case No. 37-2009-00085820-CU-EI-CTL) against the City and Zounes for inverse condemnation and for violation of section 1983. After Redln amended its complaint, the court in response to respondents' demurrer sustained the demurrer with leave to amend and issued a stay pending the outcome of the writ petition. In so doing, the court noted the taking issue and the alleged civil rights violations by Zounes were not then ripe because Redln first was required to pursue its administrative remedies.

After the evidentiary hearing following remand, the court dismissed the writ petition, lifted the stay and granted Redln leave to amend its complaint. Respondents demurred to Redln's SAC, which the court sustained without leave to amend.

DISCUSSION

I

*Inverse Condemnation*

A. *Standard of Review*

On appeal from the dismissal of an action after a demurrer has been sustained, we exercise our independent judgment to determine whether the complaint states a cause of action under any theory. (*City of Morgan Hill v. Bay Area Air Quality Management Dist.* (2004) 118 Cal.App.4th 861, 869.) We accept as true all properly pleaded material facts, all facts that may be inferred from the allegations and all matters judicially noticed, but do not accept the truth of contentions, deductions or conclusions of law. (*Aubry v. Tri–City Hospital Dist.* (1992) 2 Cal.4th 962, 967.)

When a demurrer has been sustained without leave to amend, we review the decision to deny amendment for abuse of discretion. (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1386.) The court abuses its discretion when it denies leave to amend if there is a reasonable possibility an amendment would cure the defects. It is, however, the plaintiff's burden to show how the complaint could be amended. (*Ibid.*)

B. *Governing Law and Analysis*

The federal and state Constitutions guarantee real property owners "just compensation" when their land is "taken . . . for public use . . . ." (U.S. Const., 5th Amend.; Cal. Const., art. I, § 19.) "The Fifth Amendment's Takings Clause, made

7

applicable to the states through the Fourteenth Amendment, does not prohibit the taking of private property, but instead places a condition on the exercise of that power." (*Allegretti & Company v. County of Imperial* (2006) 138 Cal.App.4th 1261, 1270 (*Allegretti*), citing *Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 536-537 (*Lingle*).) "In other words, it 'is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking.' [Citation.]" (*Lingle*, at pp. 536-537.)

"The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." (*Lingle*, *supra*, 544 U.S. at p. 537.) However, as relevant to the case at bar, "government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster and . . . such 'regulatory takings' may be compensable" as well. (*Ibid.*)

Supreme Court precedent generally recognizes two "relatively narrow categories" (*Lingle*, *supra*, 544 U.S. at p. 538) of regulatory action that will be deemed per se takings: "First, where government requires an owner to suffer a permanent physical invasion of [his or] her property—however minor—it must provide just compensation." (*Ibid.*) Second, compensation is required when regulations "completely deprive an owner of '*all* economically beneficial use' of [his or] her property." (*Ibid.*, quoting *Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1019 (*Lucas*).) When there has been a "'total regulatory taking,'" the government is required to pay just compensation

8

except to the extent that "'background principles of nuisance and property law' independently restrict the owner's intended use of the property." (*Lingle*, at p. 538, quoting *Lucas*, at pp. 1026-1032.)

"Outside these two categories, regulatory takings challenges are governed by the 'essentially ad hoc, factual inquiries' set forth in *Penn Central* [*Transp. Co. v. New York City* (1978)] 438 U.S. 104 [(*Penn Central*)]. [Citations.] There is no set formula, but "'several factors . . . have particular significance." [Citation.] Primary among those factors are "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." [Citation.] In addition, the "character of the governmental action"—for instance whether it amounts to a physical invasion or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good"—may be relevant in discerning whether a taking has occurred. [Citation.] The *Penn Central* factors—though each has given rise to vexing subsidiary questions—have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or *Lucas* rules."' (*Allegretti*, *supra*, 138 Cal.App.4th at pp. 1270-1271, quoting *Lingle*, *supra*, 544 U.S. at pp. 538-539.)

"Each of these *Penn Central* inquiries aims to 'identify regulatory actions that are functionally equivalent to the classic taking in which the government directly appropriates private property or ousts the owner from his domain. Accordingly, each of

9

these tests focuses directly upon the severity of the burden that government imposes upon private property rights.'" (*Allegretti*, *supra*, 138 Cal.App.4th at p. 1271, quoting *Lingle*, *supra*, 544 U.S. at p. 539.)

Redln contends the court erred in sustaining the demurrer to its inverse condemnation cause of action because a regulatory taking occurred when respondents "improperly subjected [Redln] to permitting jurisdiction in bad faith contrary to others operating in the same zoning area without the permits [r]espondents wrongfully alleged were required, leading to [Redln's] loss of its business."  Redln further contends that between 2006 and 2008 a regulatory taking occurred under the *Penn Central* "ad hoc" test and that between 2008 and 2010 a taking occurred under the *Lucas* test.[4]

### 1. *2006-May 2008; Penn Central Analysis*

Here, the SAC alleges that during this time period, Redln continued to use the property to operate (through All in One) its business of selling used vehicles wholesale. (See, e.g., SAC, ¶¶ 20 & 31.)  In addition, the SAC alleges that even *after* the City notified Redln that it needed additional permits to operate its auto auction business on the property, Redln entered into an agreement with a co-owner of the property to purchase an undivided one-half interest in the property.  (SAC, ¶ 21.)  Moreover, *after* the City served Redln with the civil penalty order which gave Redln until November 9, 2007 to correct the violations on the property or face civil penalties, the SAC alleges Redln entered into a

---

[4]    Respondents argue that Redln raised a factual controversy by impermissibly changing its legal theory on appeal as it now seeks to apply a *Penn Central* analysis to one time frame and a *Lucas* analysis to another.  Given our decision in this case, we deem it unnecessary to reach this argument.

new lease for use of a reduced portion of the property with one of the owners of the property.  (See SAC, ¶ 24.)

Based on these allegations in the SAC, among others, we independently conclude under the *Penn Central* test that the regulatory changes proposed by the City during this period of time did not interfere with Redln's "investment-backed expectations" for use of the property such that it amounted to the "'functional[] equivalent'" of a "classic taking in which the government directly appropriates private property or ousts the owner from his domain.'"  (See *Allegretti*, *supra*, 138 Cal.App.4th at p. 1271, quoting *Lingle*, *supra*, 544 U.S. at p. 539.)

That is, from the allegations in the SAC there clearly was sufficient and substantial economic value remaining in Redln's *other* use(s) of the property that led Redln to attempt to purchase an undivided one-half interest in the property, and when that fell through, to enter into a new lease on the property despite the regulatory changes required by the City.  (See *Buckley v. California Coastal Com.* (1998) 68 Cal.App.4th 178, 193 [in determining whether there has been a regulatory taking under the *Penn Central* analysis, the inquiry requires an evaluation of the "owner's entire property holdings at the time of the alleged taking, not just the adversely affected portion"], citing *Keystone Bituminous Coal Assn. v. DeBenedictis* (1987) 480 U.S. 470, 497.)  As such, we conclude under *Penn Central* there was no regulatory taking of the property between 2006 and May 2008, when the ALJ issued the 19-page enforcement order.

2. *2008 to 2010; Lucas Analysis*

Redln next contends there was a categorical taking under *Lucas* commencing in May 2008 when the ALJ determined that Redln was required to apply for an SDP to operate its automobile auction business on the property. Redln alleges in its SAC that respondents acted in bad faith in insisting Redln needed to obtain such a permit and that as a result, it was deprived of all economically beneficial use of the property because to obtain an SDP allegedly would have taken up to two years and cost hundreds of thousands of dollars. (SAC, ¶¶ 18, 46.)

Regarding Redln's contention that respondents acted in bad faith in requiring Redln to obtain an SDP before continuing its business operations, Redln fails to recognize that an agency's subjective motives are for the most part irrelevant. (See *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.) "The proper inquiry is not into the subjective motive of the government agency, but whether there is, objectively, sufficient connection between the land use regulation in question and a legitimate governmental purpose so that the former may be said to substantially advance the latter." (See *Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006, 1022 (*Landgate*), citing *Nollan v. California Coastal Com.* (1987) 483 U.S. 825, 836-837 and *Dolan v. City of Tigard* (1994) 512 U.S. 374, 391.)

Here, Redln does not contend there was an objectively insufficient "connection between the land use regulation in question and a legitimate governmental purpose . . . ." (See *Landgate*, *supra*, 17 Cal.4th at p. 1022.) Rather, the only issue raised by Redln

12

regarding the requirement it obtain an SDP was *when* Redln began its wholesale auction business on the property.

Exercising our independent judgment, we agree with the trial court that there was no categorical taking because respondents gave Redln the option to apply for a permit instead of vacating the property. (See SAC, ¶ 31.) The law is "quite clear" (see *United States v. Riverside Bayview Homes* (1985) 474 U.S. 121, 127) that "the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking. [Citation.] The reasons are obvious. A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. *Only* when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred." (*Ibid.*, italics added.) Here, the record clearly shows Redln never applied for an SDP. As such, it follows there was no regulatory taking.

*If* the rule was otherwise, as proposed by Redln, a total regulatory taking would result each time a governmental agency sought to regulate land use via a "permit system." (See *United States v. Riverside Bayview Homes, Inc.*, *supra*, 474 U.S. at p. 127.) Clearly, we cannot countenance such a rule.

13

Moreover, although Redln contends in its SAC that it was prevented from conducting *any business* on the property until it applied for and obtained an SDP, and thus that there was a categorical regulatory taking (because it further alleges *on information and belief* such a permit would have taken up to two years to obtain and cost potentially hundreds of thousands of dollars), we note from exhibit 4 of the SAC that what Zounes actually stated was there could be no *development* of the property.[5]

As noted, *ante*, in addition to the factual allegations of the complaint we may also consider matters which have been or may be judicially noticed. (See *Sacramento Brewing Co. v. Desmond, Miller & Desmond* (1999) 75 Cal.App.4th 1082, 1085, fn. 3.) "The complaint should be read as containing the judicially noticeable facts, 'even when the pleading contains an express allegation to the contrary.' [Citation.] A plaintiff may not avoid a demurrer by . . . suppressing facts which prove the pleaded facts false. [Citation.]" (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 877, italics omitted; see also *Hendy v. Losse* (1991) 54 Cal.3d 723, 742–743.)

Here, on our own motion, we take judicial notice of SDMC section 113.0103. (See *Stockton Citizens for Sensible Planning v. City of Stockton* (2012) 210 Cal.App.4th 1484, 1488, fn. 3 [citing Evid. Code, §§ 452, subds. (b) & (c), 459 when taking judicial notice of City of Stockton's municipal code].) The word "development" as then and now defined in SDMC section 113.0103 is very broad. It means: "the act, process, or result of dividing a parcel of land into two or more parcels; of erecting, placing, constructing,

---

5       See footnote 3, *ante*.

reconstructing, converting, establishing, altering, maintaining, relocating, demolishing, using, or enlarging any building, structure, improvement, lot, or premises; of clearing, grubbing, excavating, embanking, filling, managing brush, or agricultural clearing on public or private property including the construction of slopes and facilities incidental to such work; or of disturbing any existing vegetation."  (Italics omitted.)

It is abundantly clear from the broad definition of "development" in SDMC section 113.0103 that Redln was not precluded from conducting *any* business on the property as it alleges in the SAC, or even *some* business.  SDMC section 113.0103 instead plainly speaks to development of property, including division of property and alteration of structures and the property itself.  (See *Robert F. Kennedy Medical Center v. Belshe* (1996) 13 Cal.4th 748, 756 [noting that where the words are clear, "'we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute'" or regulation].)

Moreover, there is nothing in the record suggesting that Redln sought clarification of what it could and could not do in connection with the property if it had applied for an SDP.  For this separate reason, we independently conclude under *Lucas* there was not a total regulatory taking of the property between May 2008 and 2010.[6]

---

6    We also note that to the extent Redln allegedly was unable to operate *any business* on the property between May 2008 and June 2010 while it challenged the requirement it obtain an SDP in its writ petition, it was in large measure due to Redln's inability to proffer sufficient evidence during the initial administrative hearing in 2008 to establish *when* it commenced its automobile auction business on the property.  After the trial court ordered a supplemental evidentiary hearing in connection with Redln's writ petition, Redln was able to show an SDP was not required through a "small batch of auction receipts" ostensibly predating January 1, 2000; sales tax returns prepared by Redln's

## II

### *Violation of Civil Rights for Unlawful Policy/Custom -- Section 1983*

"Section 1983 provides in relevant part: 'Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .'"

Redln contends the court erred in sustaining respondents' demurrer to Redln's second cause of action when it ruled that neither development project manager Zounes nor code enforcement coordinator Negrete was "at the apex of the authority for the action in question." (*See Harman v. City and County of San Francisco* (2006) 136 Cal.App.4th 1279, 1298.) Instead, the court ruled that the ALJ was the "apex of authority" on whether an SDP was required. According to Redln, the court erred in ruling the ALJ was the "apex of authority" because among other things, the ALJ was not delegated policymaking authority by the City. We agree. (See *Harman v. City and County of San Francisco*, *supra*, at p. 1298 [noting that the U.S. Supreme Court has emphasized "that the

---

accountant; and the fact that Redln's office manager, who had started employment with Redln in September 1999, prepared the "forms and other related business documents for the auction business" of Redln. Although the hearing officer found the above evidence allegedly could not have been discovered by Redln before the close of the initial administrative hearing, this evidence clearly was available to Redln throughout the administrative and writ proceedings.

16

delegation of authority must relate to *policy*, which 'generally implies a course of action consciously chosen from among various alternatives'"], quoting *Oklahoma City v. Tuttle* (1985) 471 U.S. 808, 823.)

However, that does not end our discussion. Because we conclude *ante* there was no regulatory taking of Redln's property under *Penn Central* and *Lucas*, we further independently conclude there was no *constitutional injury* for liability to attach under section 1983. (See *Monell v. New York City Dept. of Soc. Serv.* (1978) 436 U.S. 658, 690 [to be liable under section 1983, a plaintiff must prove an official policy or custom caused plaintiff to suffer a constitutional injury].)

III

*Leave to Amend to State a Cause of Action for "Selective Enforcement"*

During oral argument on the demurrer, the court refused Redln's request to amend its SAC to add a cause of action for selective enforcement, noting it had never heard of such a claim. Redln contends the trial court abused its discretion when it denied Redln leave to amend the SAC to add this claim. We disagree.

"Unequal treatment which results simply from laxity of enforcement or which reflects a nonarbitrary basis for selective enforcement of a statute does not deny equal protection and is not constitutionally prohibited discriminatory enforcement." (*Baluyut v. Superior Court* (1996) 12 Cal.4th 826, 832.) "Unequal application of a statute or rule to persons entitled to be treated alike is not a denial of equal protection 'unless there is shown to be present in it an element of intentional or purposeful discrimination.'

17

(*Snowden v. Hughes* (1944) 321 U.S. 1, 8.)"  (*Cilderman v. City of Los Angeles* (1998) 67 Cal.App.4th 1466, 1470.)  "What the equal protection guarantee prohibits is state officials 'purposefully and intentionally singling out individuals for disparate treatment on an invidiously discriminatory basis.'  (*Murgia v. Municipal Court* (1975) 15 Cal.3d 286, 297.)"  (*Cilderman v. City of Los Angeles*, *supra*, at p. 1470.)

Here, we note from the SAC that it was Redln who initiated regulatory review by the City when it contacted the City in late 2005 or early 2006 about additional permits Redln would need *if* it was to conduct auctions on the property under a proposed agreement with the County.  (SAC, ¶ 16.)  This allegation in the SAC undermines Redln's contention it was subjected to selective enforcement by the City.

In any event, other than general allegations of alleged bad faith and retaliation by the City and Zounes in connection with the requirement that Redln obtain a CUP and an SDP, there is no evidence in the record of any intentional or purposeful discrimination by respondents, despite the fact this dispute between the parties is now almost seven years old, has been the subject of two administrative hearings, a writ of mandate proceeding and two demurrers.  We thus conclude, albeit for reasons different than those articulated by the trial court, that there was no abuse of discretion in rejecting Redln's last-minute attempt to amend its SAC to add a selective enforcement cause of action.

18

DISPOSITION

The judgment is affirmed.  Respondents to recover their costs of appeal.

BENKE, Acting P. J.

WE CONCUR:

O'ROURKE, J.

AARON, J.