[No. B233892. Second Dist., Div. One. June 28, 2012.]

W.M. BARR & COMPANY, INC., Plaintiff and Appellant, v.
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, Defendant
and Respondent.

408

410

**COUNSEL**

Michael L. Hickok for Plaintiff and Appellant.

Woodruff, Spradlin & Smart, Bradley R. Hogin, Ricia R. Hager; Kurt R. Wiese, William B. Wong and Lauren B. Nevitt for Defendant and Respondent.

## OPINION

JOHNSON, J.—In July 2010, the South Coast Air Quality Management District (the District) adopted "Rule 1143," which required manufacturers of consumer paint thinner and solvent products to limit the use of ozone-forming volatile organic compounds (VOC's) in their products in order to meet the District's commitment under the federal Clean Air Act (42 U.S.C. § 7401 et seq.) and the California Clean Air Act (Health & Saf. Code, § 40910 et seq.).[1] The District believed that the adoption of Rule 1143 would result in manufacturers substituting acetone for VOC's in their products, and prepared an environmental assessment under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA) evaluating the fire hazard risks of substituted acetone, and proposing specific product labeling to alert consumers to the reformulation of products under Rule 1143. W.M. Barr & Company, Inc. (Barr), a manufacturer of paint thinners and solvents, challenged Rule 1143 on the grounds that (1) Rule 1143 was preempted by the Federal Hazardous Substances Act (FHSA; 15 U.S.C. § 1261 et seq.); (2) Rule 1143 was preempted by regulations simultaneously promulgated by California's State Air Resources Board (the Board); and (3) the District did not comply with CEQA because Rule 1143 failed to consider alternatives to the measures it adopted.

The trial court rejected these claims, finding that (1) the FHSA did not preempt Rule 1143 because Rule 1143's product labeling did not address the same risks as the FHSA; (2) Rule 1143 did not conflict with the Board regulations because Rule 1143 was enacted for a different purpose; and (3) the District's environmental assessment of Rule 1143 complied with CEQA because it determined that Rule 1143 would create no significant impacts on the environment, and thus need not consider alternatives or mitigation measures. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### 1. *The Parties and General Regulatory Framework*

Barr, domiciled in Tennessee, is one of the largest retail suppliers of solvents within the United States, and distributes its products nationally.

---

[1] The California Clean Air Act is found in a number of nonconsecutive provisions of the Health and Safety Code commencing with section 39000. However, its principal provisions are found commencing with Health and Safety Code section 40910.

Barr's products currently use mineral spirits as the primary solvent component.[2] Barr stands to lose substantial revenue and incur significant costs in complying with Rule 1143.

The District was created in 1977 pursuant to Health and Safety Code section 40410, and has the responsibility for developing and enforcing air pollution control rules within parts of the Counties of Los Angeles, Orange, Riverside, and San Bernardino (those counties making up the South Coast Air Basin). (Health & Saf. Code, §§ 40410–40540.) The District is required to adopt an air quality management program (AQMP) that complies with federal and state ambient air quality standards for the district. (Health & Saf. Code, § 40460, subd. (a).)

Pursuant to the Federal Clean Air Act, the Environmental Protection Agency (EPA) sets ambient air quality standards for a number of pollutants, including ozone,[3] at levels "requisite to protect the public health." (42 U.S.C. § 7409(b)(1).) The EPA has adopted National Ambient Air Quality Standards (NAAQS) for certain pollutants, including ozone. (40 C.F.R. § 50.10 (2012).) In addition, the EPA has designated air quality control regions; metropolitan Los Angeles is one such area. (40 C.F.R. § 81.17 (2012).) Each state must adopt a plan to implement, maintain, and enforce the national air quality standards. (42 U.S.C. § 7410(a)(1); Health & Saf. Code, § 39000 et seq.) In state regions that have "nonattainment" status for NAAQS, the state must prepare a state implementation plan (SIP) that provides for implementation, maintenance, and enforcement of air quality standards in each air quality control region (or portion thereof) within such state. The SIP must "include

---

[2] "Paint thinners and multi-purpose solvents are available at a variety of retail outlets, including mass merchants like Lowe's and Home Depot, as well as smaller hardware stores. Approximately 1,212,932 gallons of high-VOC containing solvents are sold in [the District's] jurisdiction each year, mostly for multi-purpose solvent use, with a small portion used to thin solvent-based paints. Prior to the adoption and implementation of Rule 1143, traditional product formulations consisted of solvents, including toluene, mineral spirits and xylene, aqueous and soy technologies (methyl esters), as well as exempt solvents such as acetone and parachlorobenzotriflouride (PCBTF)." (District, Final Supplemental Environmental Assessment for Proposed Amended Rule 1143—Consumer Paint Thinners and Multi-Purpose Solvents, p. 7.)

[3] Ozone is not controlled directly, but is controlled by limiting emission of VOC's and nitrogen oxides. "Ground-level ozone is not emitted directly from mobile or stationary sources but is the result of chemical reactions of volatile organic compounds (VOCs), nitrogen oxides ($NO_x$), and oxygen in the presence of sunlight and elevated temperatures. It is chemically identical to stratospheric ozone, which occurs miles above the earth's surface and provides a protective shield from excess ultraviolet radiation. However, ground-level ozone at sufficient concentrations is a primary component of 'smog' and is associated with harmful health effects, including decreased lung function and other respiratory problems. Common sources of ozone precursors include $NO_x$ emissions from utilities, motor vehicles and other fossil fuel-burning sources and VOCs found in paints, solvents, gasoline, and petroleum products generally." (Wooley & Morss, Clean Air Act Handbook (2011) § 1:6.)

enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter," and "provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to . . . [¶] . . . monitor, compile, and analyze data on ambient air quality." (42 U.S.C. § 7410(a)(2)(A), (B)(i).)

In addition, the Board is "the state agency charged with coordinating efforts to attain and maintain ambient air quality standards, [and] to conduct research into the causes of and solution to air pollution." (Health & Saf. Code, § 39003.) The Board has adopted ambient air quality standards (CAAQS) for the South Coast Air Basin and the other air quality basins within California. (Health & Saf. Code, § 39606.) Similar to the EPA, the Board must determine attainment status for the air quality basins within California, and must prepare an attainment plan for each nonattainment region. (Health & Saf. Code, §§ 39608, 40911.)

The District's AQMP serves as both the SIP under the Clean Air Act and the attainment plan under state law. (Health & Saf. Code, §§ 40408, 40412, 40460.) The AQMP sets forth measures to achieve and maintain attainment in the District. (Health & Saf. Code, § 40913.)

2. *Rule 1143*

The South Coast Air Basin suffers from a serious ozone problem; under the Clean Air Act, the Basin has been designated as a nonattainment area for NAAQS ozone levels since 1978, and nonattainment for CAAQS since 1989. (See 43 Fed.Reg. 8962, 8972 (Mar. 3, 1978); Cal. Code Regs., tit. 17, § 60201.) Against this backdrop of regulation, the District's 2007 AQMP ozone reduction strategy was implemented by regulating the VOC and $NO_x$ content of consumer solvents and paint thinners, and the District adopted control measure No. CTS-04 to reduce the VOC content of consumer products. Ultimately, the District adopted Rule 1143 to combat ground-level ozone formation fueled by the release of VOC's into the air from consumer multipurpose solvents and paint thinners. The District believed that at full implementation, Rule 1143 would reduce VOC emissions by 3.81 tons per day in the South Coast Air Basin.

On March 6, 2009 the District adopted the first version of Rule 1143 governing consumer multipurpose solvents[4] and consumer paint thinners.[5] Rule 1143 required manufacturers of paint thinners and multipurpose solvents to limit VOC content to 300 grams per liter by January 1, 2010, with a final limit effective January 1, 2011, of 25 grams per liter. Both limits were subject to a one-year sell-through period permitting the sale of noncompliant products for a year after the effective date of each limit as long as the products were manufactured before the effective date of the limit.

### 3. *The District's Environmental Assessment*

Pursuant to CEQA, the District released a draft environmental assessment[6] for Rule 1143 for a 30-day comment period from November 13, 2008, to December 12, 2008. The environmental assessment noted that Rule 1143 had "no provisions that would dictate the use of any specific material," to account for lowered VOC's, but that under the " 'worst-case' scenario," the District believed most conventional solvents would be reformulated with acetone because acetone does not contribute appreciably to ozone formation and is not a VOC, although acetone has a liquid flashpoint below 100 degrees Fahrenheit.[7] Acetone has a wide variety of household applications; such formulations advise the user to keep it away from heat, sparks, flame and other sources of ignition. The District concluded that the use of acetone in paint thinners and multipurpose solvents as a result of the implementation of Rule 1143 would not increase the risk of fire hazard because acetone was already widely used, distributed and sold.

During the public comment period, the Office of the State Fire Marshal voiced concern to the Board about the potential increased use of acetone in paint thinners and multipurpose solvents based upon acetone's low flashpoint.

---

[4] Rule 1143 defined multipurpose solvents in relevant part as "solvents that do not display specific use instructions on the product container or packaging; products that do not specify an end-use function or application on the product container or packaging . . . ."

[5] Rule 1143 defined paint thinners as "solvents that are manufactured for the purpose of reducing the viscosity of coating compositions or components and displays the terms, but not limited to, 'Paint Thinner,' 'Lacquer Thinner,' 'Thinner,' or 'Reducer' on the front panel of its packaging."

[6] Pursuant to CEQA, an agency operating pursuant to a certified regulatory program is subject only to certain abbreviated CEQA requirements. The District's certified regulatory program is exempt from CEQA's environmental impact report (EIR) requirement; thus, as addressed more fully below, the District may prepare an environmental assessment (EA) in lieu of an EIR or a negative declaration. (Pub. Resources Code, § 21080.5, subd. (a); district rule 110.)

[7] The "flashpoint" of a chemical is the temperature at which it bursts into flames when exposed to an ignition source. The flashpoint for mineral spirits, the solvent primarily used in paint thinners prior to the adoption of Rule 1143, is between 109 and 113 degrees Fahrenheit. The flashpoint for acetone is -4 degrees Fahrenheit.

The Board agreed with the District's assessment that acetone would constitute the predominant method of compliance with the second tier limit of 25 grams per liter effective January 1, 2011, and observed that the fire marshal was concerned about the risk of fire from increased availability of acetone labeled as a paint thinner. However, although the District sought further input from the State Fire Marshal, none was received before adoption of Rule 1143.

At the March 6, 2009 public hearing on Rule 1143, Dr. Laki Tisopolus of the District testified that paint thinners and solvents accounted for more than 10 tons a day of unregulated sources of VOC's. Nonetheless, although acetone is highly flammable, the District asserted it had adequately assessed acetone's flammability extensively in the past in connection with other district rules it had promulgated, and through working very closely with affected fire departments.

Steve Bunting, the division chief, fire marshal, of Newport Beach and president of the Orange County Fire Marshal's Association, spoke at the hearing and stated that the prior Monday, he had received a "frantic" phone call from the Office of the State Fire Marshal asking whether he knew anything about Rule 1143, and asking whether he could participate in a phone call with District staff. Chief Bunting participated in the call, and subsequently learned that none of his colleagues in Orange County were aware of Rule 1143; indeed, he did not believe he had sufficient time to respond to the rule. Acetone's low flashpoint was a "big red flag" for Chief Bunting.

The District responded to these fire concerns by directing its staff to meet with Chief Bunting and other fire department officials and recommend further action to the District.

### 4. *Barr's First Challenge to Rule 1143* (Barr I)

On April 1, 2009, Barr commenced an action seeking a writ of mandate under Public Resources Code section 21168.9 and Code of Civil Procedure section 1085 challenging the adoption of Rule 1143. Barr alleged that Rule 1143 disregarded the increased fire risk posed by the addition of acetone to solvents and paint thinners. Barr presented evidence its paint thinners and solvents are made with mineral spirits, which have a flashpoint of 104 degrees, compared with -4 degrees for acetone; as a result, paint thinners made with acetone would catch fire when exposed to a spark, while those with mineral spirits would not.

While *Barr I* was pending, between March and September 2009, the District held numerous meetings with the State Fire Marshal, local fire officials, and Board staff. Chief Bunting pointed out that many solvents and

paint products are marketed under a name that does not reflect their constituent ingredients. Fire officials were concerned that if a manufacturer reformulated its product with acetone in order to comply with Rule 1143, past users of the product would not be aware of the product's lower flashpoint.

Around this time, the Board was in the process of adopting regulations addressing the increased use of acetone in paint thinners and solvents.[8] Ultimately, the Board adopted a labeling requirement to warn consumers of potential product changes, and required any flammable or extremely flammable multipurpose solvent or paint thinner to either (1) be accompanied by a hang tag or sticker indicating that the product has been formulated to meet California VOC limits and directing attention to the product's warning labels, or (2) display the common name of the chemical that causes the product to be labeled flammable or extremely flammable. This regulation became effective on December 31, 2010. (Cal. Code Regs., tit. 17, § 94512, subd. (e).)

The court in *Barr I* held that there was significant evidence of the fire hazard raised by acetone-based paint thinners, triggering the District's duty to address the issue in its EA by considering every fair argument about possible significant effects and the District's reasons for deciding that impacts are insignificant. "Plainly, the opinion of the Fire Marshal, supplemented by the Southern California fire department representatives, the advice of [the Board], and the comments of trade groups and Barr, is significant evidence that acetone-based paint thinners will create an increased risk of fire hazard." Thus, the court concluded the EA was deficient in its consideration of the fire hazard: "[t]he obvious problem with [the District's] analysis is that it fails to rely on any pertinent expert opinion, or even address, the issue—whether acetone-based paint thinner is a significantly higher fire risk than mineral-based paint thinner."

The court held that the District failed to adequately consider and document the fire hazard associated with Rule 1143's effective substitution of acetone-based paint thinner for current products, and ordered the District to prepare a supplemental environmental assessment that considered the fire hazard issue, and on December 7, 2009, the court issued its ruling. In April 2010, the court ordered the District to rescind Rule 1143's final VOC limit pending further CEQA review, but permitted the District to keep in place the interim limit.

In July 2010, the District filed its supplemental environmental assessment for proposed amended Rule 1143. Amended Rule 1143 changed its definitions

---

[8] The Board's adoption of regulations affecting paint thinners and multipurpose solvents is discussed in more detail below at part III of the discussion.

of paint thinners[9] and multipurpose solvents.[10] The supplemental environmental assessment addressed the relative flashpoints of potential replacement solvents with existing solvent ingredients in great detail. In addition, Rule 1143(e)(2) now contained a hangtag labeling feature:

"(A) Products [must] include an attached 'hang tag' or sticker that displays, at a minimum, the following statement: 'Formulated to meet low VOC limits: see warnings on label.'

"(B) Products which include an attached 'hang tag' or sticker that displays, at a minimum the following statement: 'Formulated to meet low VOC limits' with [the common name of the chemical compound (e.g., 'Acetone', 'Methyl Acetate', etc.)] that results in the product meeting the criteria for 'Flammable' or 'Extremely Flammable.'

"(C) Products which include an attached 'hang tag' as a second Principal Display Panel that displays, at a minimum, the following statement: 'Formulated to meet low VOC limits' placed adjacent to and associated with the required Consumer Product Safety Commission (CPSC) warning.

"(D) Products where the Principal Display Panel displays, in a font size as large as, or larger than, the largest font size of any other words on the panel, the following statement: 'Formulated to meet low VOC limits' placed adjacent to and associated with the required CPSC warning.

---

[9] Amended Rule 1143 now defined paint thinners as "CONSUMER PAINT THINNERS are any liquid products used for reducing the viscosity of coating compositions or components for personal, family, household, or institutional use, including, but not limited to, products that prominently display the term 'Paint Thinner,' 'Lacquer Thinner,' 'Thinner,' or 'Reducer' on the front panel of its packaging."

[10] Amended Rule 1143 now defined multipurpose solvents as "CONSUMER MULTI-PURPOSE SOLVENTS are any liquid products designed or labeled to be used for dispersing or dissolving or removing contaminants other organic materials for personal, family, household, or institutional use including but not limited to the following: (1) products that do not display specific use instructions on the product container or packaging, (2) products that do not specify an end-use function or application on the product container or packaging, (3) solvents used in institutional facilities, except for laboratory reagents used in analytical, educational, research, scientific or other laboratories, (4) 'Paint clean-up' products, and (5) products labeled to prepare surfaces for painting. For the purpose of this definition only, 'Paint clean-up' means any liquid product labeled for cleaning oil-based or water-based paint, lacquer, varnish, or related coatings from, but not limited to, painting equipment or tools, plastics or metals. [¶] 'Consumer Multi-purpose Solvents' do not include solvents used in cold cleaners, vapor degreasers, conveyorized degreasers or film cleaning machines, or solvents that are incorporated into, or used exclusively in the manufacture or construction of, the goods or commodities at the site of the establishment. 'Multi-purpose Solvents' also do not include any products making any representation that the product may be used as, or is suitable for use as a consumer product which qualifies under another definition in California Code of Regulations Title 17, § 94508 as of the date of adoption."

"(E) Products where the Principal Display Panel displays, in a font size as large as, or larger than, the largest font size of any other words on the panel, the common name of the chemical compound (e.g., 'Acetone,' 'Methyl Acetate,' etc.) that results in the product meeting the criteria for 'Flammable' or 'Extremely Flammable.'

"(F) Products that meet the labeling requirements of the CARB [California Air Resources Board] Consumer Product Regulation specified in title 17, CCR, section 94512(e) as adopted."

Rule 1143 provided that if the manufacturer did not want to use a warning hang tag, the manufacturer could change the product name to reflect its content by using a name that was the common name of the chemical compound it contained, such as "acetone," or "methyl alcohol." Amended Rule 1143 also included a public outreach program involving brochures and public service announcements.[11]

Barr's comments to proposed amended Rule 1143 asserted that any warning label requirements were preempted by the FHSA under regulations promulgated by CPSC. Further, Barr cited serious accidental fires that had occurred where workers used acetone-based cleaners, thus rendering any warning ineffective to reduce the fire hazard to less than significant. Barr concluded with a request that the District consider more effective mitigation measures and alternatives to the proposed amendments to Rule 1143.

Chief Bunting advised the District that the consumer warning hang tags and consumer educational programs fully addressed his concern regarding the fire hazards associated with increased acetone content in multipurpose solvents and paint thinners. Chief Bunting's primary concern with Rule 1143 as initially proposed was the "potential risk to consumers who are accustomed to using 'combustible' multi-purpose solvents and paint thinners and who may not be aware that the multi-purpose solvents and paint thinners may

---

[11] Rule 1143's public outreach provision provided: "In conjunction with the changes in VOC content limits, the Executive Officer shall develop a public education and outreach program to inform consumers of potential product changes that use more flammable substances by jointly working with the local fire departments to include, but not be limited to: public service announcements in both English and Spanish to be aired on television and radio from October 2010 to January 2012; training retailers, including big box retailers at their corporate headquarters, in November 2010 about these potential changes so that they may alert their consumers; dissemination of 25,000 hardcopy brochures in several languages from November 2010 to January 2012; alerts through Twitter, and placement of electronic brochures and Public Service Announcements (PSAs) on [District], [Board], YouTube, local fire department and local city websites from November 2010 to January 2012. The Executive Officer shall report the status of the public education and outreach program to the Stationary Source Committee in November 2010 and in November 2011. The Executive Officer may extend the public education and outreach program beyond January 2012, if he determines that additional consumer education is needed." (Amended Rule 1143(e)(7).)

change to 'flammable' or 'extremely flammable' after Rule 1143's 25 g/l limit takes effect. Generally, a 'combustible' liquid has a flashpoint above 100 degrees Fahrenheit while a 'flammable' liquid has a flashpoint above 20 degrees Fahrenheit and below 100 degrees Fahrenheit. An 'extremely flammable' liquid has a flashpoint at or below 20 degrees Fahrenheit." Chief Bunting opined that as a result of amended Rule 1143, any increased fire risk from acetone-based paint thinners, compared to mineral spirit-based paint thinners, would be mitigated to a less than significant level by the hang tag and other consumer admonition requirements of Rule 1143.

As a result, the District concluded that amended Rule 1143 "has less than significant fire hazard impacts based upon the Rule's incorporation of a labeling requirement alerting potential purchasers that the regulated product, if reformulated to be more flammable, has been changed so that it is more flammable."

By Resolution No. 10-21, the District adopted amended Rule 1143 on July 9, 2010.

### 5. *Barr's Second Challenge to Rule 1143* (Barr II)

On July 15, 2010, Barr filed its second challenge to Rule 1143, seeking a writ of mandate and injunctive and declaratory relief, alleging (1) the supplemental environmental assessment was inadequate under CEQA because the hang tag was inadequate to warn consumers of the fire hazard, and the public outreach program was voluntary and thus ineffective; (2) Rule 1143's warning hang tag was preempted by the FHSA; and (3) Rule 1143 was preempted by preexisting Board consumer standards.

On August 24, 2010, the trial court denied injunctive relief, finding that Barr had not established a likelihood of success on the merits, and further found that the comparative interim harm suffered by the parties would be greater to the District.

On May 31, 2011, the trial court denied Barr's petition for writ of mandate. The court found the supplemental environmental assessment addressed the relative flammability of each product, fire officials provided detailed comments, and consumer warnings would avoid significant fire hazards. Thus, the supplemental environmental assessment adequately addressed the fire hazards and supported the District's finding of no significant fire hazard. The court specifically found the supplemental environmental assessment was not required to contain either alternatives and mitigation measures because under CEQA, alternatives and mitigation were required only where the project would have a significant impact upon the environment; here, substantial

evidence supported the District's conclusion the project (Rule 1143) would not have a significant impact upon the environment.

The court further found Rule 1143's consumer warning program was not preempted by federal law because (1) the consumer warnings of Rule 1143 did not address the same risk and (2) the consumer warning program of Rule 1143 was voluntary, because manufacturers had the option of changing the product name to a generic description rather than placing hang tags or stickers on their products. Lastly, the court found Rule 1143 did not conflict with Board regulations because Rule 1143 was adopted for a different purpose; the Board had acknowledged it had not adopted paint thinner VOC regulations; and overlapping agency regulations were permissible. (See *Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 936 [38 Cal.Rptr.3d 220, 126 P.3d 1040].)

## DISCUSSION[12]

### I. *Federal Preemption*

Barr argues that Rule 1143 is preempted by the FHSA because the hang tag addresses the same fire risks as the FHSA. Barr further argues the trial court's finding the labeling requirement was voluntary is inconsistent with the District's position that the labeling requirement addressed the increased fire risk. We disagree.

Congress enacted the FHSA in 1960 to "provide nationally uniform requirements for adequate precautionary labeling of packages of hazardous substances." (H.R. No. 1861, 86th Cong., 2d Sess., § 2, p. 1 (1960), reprinted in 1960 U.S. Code Cong. & Admin. News, p. 2833.) Under the FHSA, the content of language on labels of certain hazardous substances is specifically prescribed by regulations promulgated by the Consumer Product Safety Commission as set forth at 16 Code of Federal Regulations, part 1500.121 (2012).

---

[12] Barr contends that the District did not raise the issue of the hang tag in the trial court, and thus we cannot consider the District's arguments the hangtag saves Rule 1143 from federal and state preemption challenges as well as CEQA violations. This argument fails: Barr specifically raised the warning label requirement of Rule 1143, but in citing that rule, chose to omit any language referencing the hang tag and paraphrased the Rule. (See, e.g., Barr's verified petition for writ of mandate [raising warning label requirement issue]; Barr's opening brief at page 2, paraphrasing language of Rule 1143 and omitting any reference of hang tag.) For example, Rule 1143 states at subsection (e)(2)(A) that it does not apply to products that "include an attached 'hang tag' or sticker that displays, at a minimum, the following statement: 'Formulated to meet low VOC limits: see warnings on label.' " Barr quotes Rule 1143(e)(2)(A) to omit any reference to a hang tag instead merely saying the label must state, " 'Formulated to meet low VOC limits, see warnings on labels.' " Further, the hang tag was discussed at the hearing on the writ petition.

The FHSA provides that cautionary labeling must appear on "all accompanying literature where there are directions for use, written or otherwise." (15 U.S.C. § 1261(n).) Accompanying literature is described as "any placard, pamphlet, booklet, book, sign, or other written, printed or graphic matter or visual device that provides directions for use, written or otherwise, and that is used in connection with the display, sale, demonstration, or merchandising of a hazardous substance . . . ." (16 C.F.R. § 1500.3(c)(9) (2012).)

FHSA does not require any special language in its warning labels; rather, it requires that labels contain the signal words "WARNING" or "CAUTION"; words which describe the particular hazard, such as "Flammable"; and cautionary words, describing the action to be followed or avoided in the product's use. (15 U.S.C. § 1261(p); 16 C.F.R. § 1500.121(a)(2)(vi), (vii) (2012).) Further the FHSA defines "container" as the "immediate package from which a hazardous substance may be dispensed" (16 C.F.R. § 1500.121(a)(2)(i) (2012)), and requires "[p]rominent label placement" (italics omitted) on the immediate container "and, if appropriate, on any other container or wrapper." (16 C.F.R. § 1500.121(b)(2)(i) (2012).)[13]

As enacted, the FHSA did not contain a preemption provision. However, in 1966, when the FHSA was amended, Congress recommended " 'a limited preemption amendment which would encourage and permit states to adopt requirements identical with the federal requirements for substances subject to the Federal Act, and to enforce them to complement Federal enforcement. . . .' [Citation.]" (*Moss v. Parks Corp.* (4th Cir. 1993) 985 F.2d 736, 739.) The 1966 amendments added a preemption provision providing "if a hazardous substance or its packaging is subject to a cautionary labeling requirement under section 2(p) or 3(b) [(15 U.S.C. §§ 1261(p) or 1262(b))] designed to prevent against a risk of illness or injury associated with the substance, no State or political subdivision of a State may establish or continue in effect a cautionary labeling requirement applicable to such substance or packaging and *designed to protect against the same risk of illness or injury unless such cautionary labeling requirement is identical to the labeling requirement under section 2(p) or 3(b) [(subd. (p) of this section or § 1262(b) of this title)]*." (Historical and Statutory Notes, Effect upon Federal and State Law, 15 U.S.C.A. (2007) foll. § 1261, p. 221, italics added.)

■ "The supremacy clause of the United States Constitution establishes a constitutional choice-of-law rule, makes federal law paramount, and vests Congress with the power to preempt state law." (*Viva! Internat. Voice for*

---

[13] Examples of labels for several flammable products implementing the FHSA warning label requirements are included in the administrative record, including acetone, xylene, and methyl ethyl ketone (M.E.K.).

*Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935 [63 Cal.Rptr.3d 50, 162 P.3d 569].) "There is a presumption against federal preemption in those areas traditionally regulated by the states . . . ." (*Id.* at p. 938.) Therefore, " '[w]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' [Citations.]" (*Ibid.*)

■ "There are four species of federal preemption: express, conflict, obstacle, and field." (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc., supra,* 41 Cal.4th at p. 935.) Where, as here, "express preemption arises when Congress 'define[s] explicitly the extent to which its enactments pre-empt state law. [Citation.] Pre-emption fundamentally is a question of congressional intent, [citation], and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.' [Citations.]" (*Id.* at p. 936.) "Where a statute 'contains an express pre-emption clause, our "task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." ' [Citation.]" (*Id.* at p. 941, fn. 6.) Where, as here, the facts are not in dispute, preemption is a question of law we review de novo. (*People ex rel. Lundgren v. Cotter & Co.* (1997) 53 Cal.App.4th 1373, 1380 [62 Cal.Rptr.2d 368] (*Cotter*).)

■ As explained in *Chemical Specialties Manufacturers Assn., Inc. v. Allenby* (9th Cir. 1992) 958 F.2d 941 (*Allenby*), "a national safety standard would ease the burden of compliance for chemical product manufacturers by relieving them from the burden of complying with fifty-one separate regulatory schemes promulgated by each state and the federal government. On the other hand, such a standard would take police powers away from the states who best know how to serve the interests of their citizenry. The preemption clause in FHSA balances these competing concerns by leaving cautionary labeling requirements to the federal government while allowing states to regulate the sale and use of hazardous chemicals." (*Id.* at p. 950.)

In *Allenby*, the court addressed preemption of the California Safe Drinking Water and Toxic Enforcement Act (Proposition 65) by FHSA, in particular whether point of sale warnings under Proposition 65 were preempted by FHSA. Proposition 65 provided that "[n]o person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual . . . ." (Italics omitted; see Health & Saf. Code, § 25249.6.) Although Proposition 65 had several methods of compliance, Proposition 65's "safe harbor regulations designate[d] the following language as sufficient to satisfy Proposition 65: 'Warning: This product contains a chemical known to the State of California to

cause cancer.' [Citation.] A retail outlet can comply with Proposition 65 by posting a sign in a visible place specifying the products that are known to the state to cause cancer or that are reproductively toxic." (*Allenby, supra*, 958 F.2d at p. 944; see Cal. Code Regs., tit. 22, former § 12601(b)(3) [now Cal. Code Regs., tit. 27, § 25603.1].)

*Allenby* held that the safe harbor point of sale warnings were not "directions for use" under 16 Code of Federal Regulations part 1500.3(c)(9) (1991) and thus were not preempted under FHSA. (*Allenby, supra*, 958 F.2d at pp. 949–950.) *Allenby* further concluded the FHSA preemption scheme was designed to meet the competing interests of those who view federal requirements as merely minimum standards and those who would opt for uniform national requirements. (958 F.2d at p. 950.) The preemption clause in FHSA balanced the competing concerns of a national safety standard and the desire for state police power in regulating warnings and sales by leaving cautionary labeling requirements to the federal government while allowing states to regulate the sale and use of hazardous chemicals. (958 F.2d at pp. 949–950.)

Subsequently, in *Cotter, supra*, 53 Cal.App.4th 1373, the court considered *Allenby*'s viability in light of two recent U.S. Supreme Court decisions on preemption, *Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470 [135 L.Ed.2d 700, 116 S.Ct. 2240] (*Medtronic*), which held that the Medical Device Amendments of 1976 (Pub.L. No. 94-295 (May 28, 1976) 90 Stat. 539) did not preempt state law claims based upon negligent design (*Medtronic*, at p. 488), and *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504 [120 L.Ed.2d 407, 112 S.Ct. 2608] (*Cipollone*), which held that federal law preempts state law claims based on inadequate warnings about health risks.

■ *Cotter* identified several principles set forth in *Medtronic* and *Cipollone*. Citing *Medtronic*, the court stated that " '[p]reemption analysis starts with the presumption that the traditional police powers of states are not displaced by federal law unless displacement was the "clear and manifest purpose of Congress." ' " (*Cotter, supra*, 53 Cal.App.4th at p. 1380; see *Medtronic, supra*, 518 U.S. at p. 485.) If the statute contains an express preemption clause, and "when that provision provides a 'reliable indicium of congressional intent with respect to state authority' [citation], 'there is no need to infer congressional intent to pre-empt state laws from the substantive provisions' of the legislation." (*Cipollone, supra*, 505 U.S. at p. 517; see *Cotter*, at p. 1381.) As a result, where Congress enacts an express preemption clause, the court need only consider the "domain expressly pre-empted." (*Cipollone*, at p. 517; see *Cotter*, at p. 1382.) Further, "[t]he court in *Medtronic* stated courts should broadly interpret the preemption provision of federal statutes with limited applicability and narrowly interpret those statutes with general applicability." (*Cotter*, at p. 1382, citing *Medtronic*, at pp. 488–489.)

Applying these principles to the FHSA and Proposition 65, *Cotter* concluded that the FHSA was an "extremely broad" statute, applying to numerous products in a variety of industries and did not require specific language on labels. "[T]he generality of these requirements makes it clear the federal government has not 'weighed the competing interests relevant' to the particular hazardous material and has not 'reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers.' . . ." (*Cotter, supra,* 53 Cal.App.4th at p. 1388, quoting *Medtronic, supra,* 518 U.S. at p. 501.) "Given the FHSA's general applicability, point of sale signs are unlikely to interfere with the federal government's objectives. Point of sale signs obviously do not require manufacturers to develop more than one label for all 50 states. Moreover, point of sale signs allow the state to regulate sales, a distinctively state interest, without imposing additional labeling requirements on packages. Rather than conflicting with the federal government's objectives, they serve to further the purpose of the FHSA by providing a larger audience with information." (*Cotter,* at p. 1388.)

Here, we apply the principles set forth in *Cotter* and *Allenby* to Barr's claims; although *Cotter* and *Allenby* did not discuss hang tags but applied to point of sale signs, both point of sale signs and hang tags are functionally similar because they are not labels. We find Barr's FHSA preemption arguments fail for two reasons. First, the language of the FHSA, which covers "directions for use," does not expressly preempt the hang tag option because the hang tag—which states that the product had been "Formulated to meet low VOC limits; see warnings on label"—does not constitute directions for use under federal labeling requirements. Further, it is possible for manufactures to comply with both labeling requirements of FHSA and the hang tag option of Rule 1143 in their entirety: Rule 1143 does not require manufacturers to adjust the federally regulated label in any manner, but only introduces a hang tag intended to further draw attention to the warning label already regulated by FHSA.

In addition, while Rule 1143 ostensibly addresses "increased fire hazard," the hang tag does not directly address fire hazards. Rather, the primary (and narrower) risk the hang tag addresses is the risk the user will not be familiar with the hazards of the product because it has been reformulated to comply with Rule 1143. The broader question of fire risk is secondary to Rule 1143, and remains governed by the FHSA and relevant regulations.

Nonetheless, Barr relies on *Moss v. Parks Corp., supra,* 985 F.2d 736, to support the argument that Congress intended to preempt state labeling requirements that are not identical to those required under FHSA and Rule

1143 falls within the scope of this rule. In *Moss*, the plaintiff appealed summary judgment in favor of the defendant in a tort action for failure to warn under FHSA labeling requirements. (985 F.2d at p. 737.) The court affirmed the judgment of the district court, holding the defendant complied with all labeling requirements under FHSA and any additional labeling requirements under state law would have been preempted. (985 F.2d at pp. 740, 742.) The court further held that tort actions under FHSA could only be brought where a defendant failed to comply with federal labeling requirements. (985 F.2d at p. 740.) *Moss* is not controlling; nor is it factually on point because *Moss* dealt with a common law tort claim based on failure to warn as opposed to a question of regulation of the content of consumer products. Accordingly, we find the hang tag option of Rule 1143 is not preempted by FHSA.[14]

## II. *State Preemption*

Barr argues that under Health and Safety Code section 41712, subdivision (f), Rule 1143 is preempted by the Board's general purpose cleaner regulation, which bars the District from adopting a regulation for a consumer product for which the Board has already adopted a regulation. Barr asserts that because the Board adopted a regulation for general purpose cleaners in 1994 at California Code of Regulations, title 17, section 94509, subd. (a), Rule 1143 conflicts with this regulation, and is preempted. Barr further argues that the trial court erred in applying two decisions allowing overlapping state regulations, *Pacific Lumber Co. v. State Water Resources Control Bd., supra,* 37 Cal.4th 921, and *Western Oil and Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408 [261 Cal.Rptr. 384, 777 P.2d 157]. The District argues that Barr is attempting to create a loophole for paint thinners because amended Rule 1143's definition of multipurpose solvents excludes products otherwise covered by Board regulations; even if Rule 1143 has some overlap with Board regulations, it is not preempted because the California Supreme Court has held districts can regulate in the absence of Board regulation; and courts should defer to the Board's interpretation of Health and Safety Code section 41712, subdivision (f).

---

[14] Barr makes two other arguments in its opening brief: First, Barr argues the trial court's preemption analysis was flawed because it was based upon an assumption the warning program was voluntary; it asserts this assumption is contrary to the administrative record, which demonstrates the labeling specifications of Rule 1143 are a requirement, and a voluntary requirement would not effectively mitigate the fire hazard. The trial court noted the hang tag was voluntary because producers could opt to give their product a generic name; if they do not, the hang tag labeling specified under Rule 1143 is not voluntary. Second, Barr complains that the trial court erroneously cited *Ray v. Atlantic Richfield Co.* (1978) 435 U.S. 151 [55 L.Ed.2d 179, 98 S.Ct. 988] in support of its preemption analysis by using *Ray* for the proposition that the availability of a nonpreempted option may avoid federal preemption. (*Id.* at pp. 172–173.) As we conclude that Rule 1143 is not federally preempted, we need not consider this argument.

A. *Legal Background*[15]

In 1988, under the newly created California Clean Air Act, the Legislature gave the Board authority to limit the VOC content of consumer products. (Stats. 1988, ch. 1568, § 1, p. 5634.) Section 41712 requires the Board to adopt regulations to achieve the maximum feasible reduction in VOC's emitted by consumer products. As originally enacted, the Clean Air Act's preemption provision relating to household consumer products[16] provided, "[p]rior to January 1, 1994, a district shall adopt no regulation relating to a consumer product which is different than any regulation adopted by the state board for that purpose." (Stats. 1988, ch. 1568, § 26, p. 5649, codified as Health & Saf. Code, § 41712, subd. (d).) That subsection remained unchanged until 1992, when it was amended to delete the phrase "[p]rior to January 1, 1994." (Stats. 1992, ch. 945, § 14, p. 4509, codified as Health & Saf. Code, § 41712, subd. (e).) In 1996, the preemption provision was moved to Health and Safety Code section 41712, subdivision (f). (Stats. 1996, ch. 766, § 1, p. 4088.)

Pursuant to Health and Safety Code section 41712, subdivision (f), the Board's preemption provision states that "[a] district shall adopt no regulation pertaining to disinfectants, nor any regulation pertaining to a consumer product that is different than any regulation adopted by the state board for that purpose." A "consumer product" is defined as "a chemically formulated product used by household and institutional consumers, including, but not limited to, detergents; cleaning compounds; polishes; floor finishes; cosmetics; personal care products; home, lawn, and garden products; disinfectants; sanitizers; aerosol paints; and automotive specialty products; but does not

---

[15] The District has requested that pursuant to Evidence Code section 452, we take judicial notice of (1) the Board's technical support document regarding its proposed regulation to reduce VOC emissions from consumer products, dated August 1990; (2) the Board's initial statement of reasons for proposed amendments to the California consumer products regulation, dated December 1999; (3) the Board's 2006 consumer & commercial products survey, including aerosol coating products; (4) preliminary draft of the Board's 2006 consumer and commercial products survey (list of responding companies); (5) the Board's 2006 consumer and commercial products survey (list of reported products); and (6) an e-mail dated October 28, 2011, from the Board to the District. Pursuant to Evidence Code sections 452 and 459, we decline to take judicial notice of these documents. (*Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325 [48 Cal.Rptr.2d 87, 906 P.2d 1242] [reviewing court need not take judicial notice of matters not before the trial court].)

[16] As originally enacted, Health and Safety Code section 41712, subdivision (c) defined a consumer product as "a chemically formulated product used by household and institutional consumers, including, but not limited to, detergents; cleaning compounds; polishes; floor finishes; cosmetics; personal care products; home, lawn, and garden products; disinfectants; sanitizers; and automotive specialty products but do not include paint, furniture coatings, or architectural coatings." Currently, the definition of "consumer product" includes "aerosol paints," which was added by a 1992 amendment (Stats. 1992, ch. 945, § 14, p. 4509). (Health & Saf. Code, § 41712, subd. (a)(1).)

include other paint products, furniture coatings, or architectural coatings." (Health & Saf. Code, § 41712, subd. (a)(1).)

As of July 9, 2010, the date the District adopted Rule 1143, the Board had not adopted any rules regulating paint thinners or multipurpose solvents.

On June 29, 2010, the Board wrote to the District giving its opinion concerning the scope of the preemption language in section 41712, subdivision (f). The Board advised the District that until the Board adopted a VOC regulation for a particular category of consumer products, air quality control districts maintained their existing legal authority to adopt a regulation. Furthermore, once the Board adopted a regulation on a product for which an air quality management district had adopted a regulation, the district's regulation would "remain[] legally effective and is not preempted by the subsequent [Board] adoption." The Board reasoned as follows: The language of Health and Safety Code section 41712, subdivision (f) regarding "pertaining to a consumer product" and "for that purpose" meant that the "restriction on district action applies only to the regulation of those specific consumer product categories (e.g., hairsprays, glass cleaners, etc.) for which volatile organic compound (VOC) standards have already been specified in [a Board] regulation. The language does not restrict district authority to regulate a particular consumer product category unless it has already been regulated by [the Board]."

With respect to the effect of a subsequent Board regulation where a district had acted, the Board reasoned that the "language of section 41712[(f)] does not specifically state that a previously adopted district regulation is automatically preempted by the subsequent [Board] adoption of a different regulation. Section 41712[(f)] merely provides that '. . . A district shall adopt no regulation . . .' that is different from any [Board] regulation. The Legislature did not state, as it could easily have done, that a district '. . . shall not adopt or enforce any regulation . . .' that is different from [a Board] regulation. The use of the term 'enforce,' or similar language, would have made it clear that previously adopted district regulations were preempted once [the Board] acted to adopt its own regulation."

The Board concluded, "[s]ince [the Board] has not yet adopted regulatory requirements for the consumer product categories of paint thinners and multipurpose solvents, [the District ] is free to do so and is not preempted by Health and Safety Code section 41712(f)."

In August 2010, subsequent to the District's adoption of Rule 1143, the Board adopted limits on the VOC content of solvent and paint thinner products. (Cal. Code Regs., tit. 17, § 94509, subd. (a) (section 94509).)[17] The Board's regulation contains different interim limitation periods (interim limit effective Dec. 31, 2010, final limit effective Dec. 31, 2013), and a three-year sell-through period. (§ 94509.)

### B. *Discussion*

#### 1. *Principles of Statutory Construction*

■ "Well-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law." (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715 [3 Cal.Rptr.3d 623, 74 P.3d 726].) "We 'attempt to give effect to statutes according to the usual, ordinary import of the language employed in framing them . . . and we construe the statutory language in its context, keeping in mind the nature and purpose of the statute in which they appear . . . .' [Citation.]" (*Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936, 950 [88 Cal.Rptr.3d 707].)
■ While "courts have final responsibility for interpreting a statute, an agency's interpretation of its governing statutes is entitled to great weight." (*Ross v. California Coastal Com.* (2011) 199 Cal.App.4th 900, 922 [133 Cal.Rptr.3d 107].) An administrative agency often interprets a statute within its administrative jurisdiction and thus " ' "may possess special familiarity with satellite legal and regulatory issues. It is this 'expertise,' expressed as an interpretation . . . [,] that is the source of the presumptive value of the agency's views" ' " in statutory construction. (*County of Butte v. Emergency Medical Services Authority* (2010) 187 Cal.App.4th 1175, 1203 [115 Cal.Rptr.3d 128].) However, "the binding power of an agency's interpretation of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Yamaha Corp. of America v. State Bd.*

---

[17] Section 94509 provides, "Except as provided in Sections 94510 (Exemptions), 94511 (Innovative Products), 94514 (Variances), 94540 through 94555 (Alternative Control Plan), and 94567(a)(1) (Hairspray Credit Program), Title 17, California Code of Regulations, no person shall sell, supply, offer for sale, or manufacture for sale in California any consumer product which, at the time of sale or manufacture, contains volatile organic compounds in excess of the limits specified in the following Table of Standards after the specified effective dates." (§ 94509, subd. (a).)

*of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031], italics omitted.)

" 'If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void.' [Citations.]" (*Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897 [16 Cal.Rptr.2d 215, 844 P.2d 534].) " 'A conflict exists if the local legislation " 'duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.' " ' . . . [¶] Local legislation is 'duplicative' of general law when it is coextensive therewith." (*Ibid.*) "Finally, local legislation enters an area that is 'fully occupied' by general law when the Legislature has expressly manifested its intent to 'fully occupy' the area [citation], or when it has impliedly done so in light of one of the following indicia of intent: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality. [Citations.]" (*Id.* at p. 898.)

> 2. *Neither Health & Safety Code Section 41712, Subdivision (f)*
> *Nor the California Air Resources Board's Regulations*
> *Preempt Rule 1143*

First, the statutory language of Health and Safety Code section 41712, subdivision (f) states, "[a] district shall adopt no regulation pertaining to disinfectants, nor any regulation pertaining to a consumer product that is different than any regulation adopted by the state board for that purpose." We agree with the Board's analysis that the phrase "any regulation adopted by the state board for that purpose" is language that implicitly refers to regulations already adopted by the Board. This language is clear that if the Board has not yet adopted a regulation in the area, an air management district would not, by definition, be able to adopt a regulation that was different. The relevant Board regulations governing paint thinners and multipurpose solvents were enacted *after* Rule 1143, not before. (See Cal. Code Regs., tit. 17, § 94509.) Thus, we agree with the Board's interpretation that Health and Safety Code section 41712, subdivision (f) only creates preemption when the Board has already acted in the area with respect to the same consumer product with the same purpose, and that the Board's subsequent enactment of a regulation with respect to a product where a district has issued regulations

does not operate to preempt the district's statute; statutes enacted by the Board and various local air quality districts may exist at the same time even if they are not identical.

III. *No Analysis of Alternatives Or Mitigation Measures Is Required Because the District's Supplemental Environmental Assessment Finding That Rule 1143 Will Not Have Any Significant Effects on the Environment Is Supported by Substantial Evidence*

Barr argues that the District failed to consider feasible alternatives and adequate mitigation measures under CEQA and thus did not comply with its own Rule 110 governing the manner in which adverse impacts must be considered. Here, Barr argues, the trial court erred in failing to apply the strict compliance standard governing such certified agencies in finding that the District was not required to consider alternatives to Rule 1143. The District argues that it properly determined the environmental impacts of Rule 1143 were not significant because the challenged attributes of Rule 1143 were design features and not mitigation measures; because the District concluded there were no significant impacts of Rule 1143 in the first instance, it was not required to consider alternatives or mitigation measures. Finally, the District contends the supplemental environmental assessment was not required to analyze alternatives because the supplemental environmental assessment is the " 'functional equivalent' " of a mitigated negative declaration, and a mitigated negative declaration need not analyze alternatives.[18] (See Pub. Resources Code, § 21064.5.)

A. *Standard of Review*

CEQA establishes the basic standard of review in a mandamus proceeding. "The standard of review in an action to set aside an agency determination under CEQA is governed by [Public Resources Code] section 21168 in administrative mandamus proceedings, and . . . section 21168.5 in traditional mandamus actions. The distinction between these two provisions 'is rarely significant. In either case, the issue before the . . . court is whether the agency abused its discretion. Abuse of discretion is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by substantial evidence.' " (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 945 [91 Cal.Rptr.2d 66].) Public Resources Code section 21080, subdivision (e)(1) provides: "For the purposes of this section and this division, substantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact."

---

[18] See pages 434 to 435, *post,* for a discussion of mitigated negative declarations.

## B. *The District Is a Certified Regulatory Program*

 CEQA establishes "a three-tiered process to ensure that public agencies inform their decisions with environmental considerations." (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112 [62 Cal.Rptr.2d 612]; see Cal. Code Regs., tit. 14 (Guidelines), § 15002(k)[19] [describing three-step process].) Under section 21080.5 of the Public Resources Code, certain certified regulatory programs have limited exemptions from CEQA's EIR. (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 126 [65 Cal.Rptr.2d 580, 939 P.2d 1280].) The certified regulatory programs are designed to avoid redundancy; if the analysis prepared pursuant to the agency's statutory or regulatory authority "essentially encompass[es]" the information that would appear in an EIR, the "preparation of a separate EIR would be redundant and a plan or other written document can be used in lieu of an EIR." (*San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 551–552 [45 Cal.Rptr.2d 117].) Such functionally equivalent documents may be relied upon in lieu of initial studies, negative declarations, and EIR's, if the documents otherwise meet CEQA's substantive requirements. (Pub. Resources Code, § 21080.5, subd. (a); Guidelines, § 15250; *City of Morgan Hill v. Bay Area Air Quality Management Dist.* (2004) 118 Cal.App.4th 861, 874–875 [13 Cal.Rptr.3d 420].) The Natural Resources Agency has certified that portion of the District's regulatory program involving the adoption, amendment, and repeal of District regulations known as "Rules." (Guidelines, § 15251, subd. (*l*).) Therefore, the District is authorized to prepare a substitute document for an EIR, negative declaration, or mitigated negative declaration. (Pub. Resources Code, § 21080.5; Guidelines, §§ 15250–15253; District rule 110.)

In lieu of a negative declaration or EIR, the District prepares what it terms "environmental assessments" before adopting any rules that are subject to CEQA. (Guidelines, § 15251, subd. (*l*).) Under Guidelines section 15252, substitute documents prepared under a certified regulatory program must contain the following information: "(1) A description of the proposed activity, and [¶] (2) Either: [¶] (A) Alternatives to the activity and mitigation measures to avoid or reduce any significant or potentially significant effects that the project might have on the environment, or [¶] (B) A statement that the agency's review of the project showed that the project would not have any significant or potentially significant effects on the environment and therefore no alternatives or mitigation measures are proposed to avoid or reduce any significant effects on the environment. This statement shall be supported by a

---

[19] The CEQA Guidelines are found at California Code of Regulations, title 14, section 15000 et seq. and were developed by the Office of Planning and Research and adopted by California's Resources Agency. (Pub. Resources Code, § 21083.)

checklist or other documentation to show the possible effects that the agency examined in reaching this conclusion." (Guidelines, § 15252, subd. (a).)

The District's rule 110 essentially restates these requirements. Rule 110 provides in relevant part as follows: "[i]t is the policy of the District to utilize an interdisciplinary approach as set forth in the District's CEQA implementation guidelines adopted by the District Board pursuant to Public Resources Code Section 21082 to prepare staff reports in a manner consistent with the environmental protection purpose of the District's regulatory program and with the goals and policies of [CEQA]. All staff reports shall contain, among other things, a description of the proposed action, an assessment of the anticipated significant long- or short-term adverse and beneficial environmental impacts associated with the proposed action, and a succinct analysis of those impacts. The analysis shall address feasible mitigation measures and feasible alternatives to the proposed action which would substantially reduce any significant adverse impact(s) identified." (District rule 110, subd. (c).) Further, "[a]ny action or proposal for which significant adverse environmental impacts have been identified during the review process shall not be approved or adopted as proposed if there are feasible mitigation measures or feasible alternatives available which would substantially reduce such adverse impact. For the purposes of this subparagraph, 'feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors, and consistent with the District's statutory authority and with federal and state laws and regulations." (District rule 110, subd. (e).)

C. *Substantial Evidence Supports the District's Finding of No Significant Effects on Environment from Rule 1143*

With respect to environmental impact, an agency has the discretion to determine whether to classify an impact as "significant," depending on the nature of the area affected. Varying thresholds of significance may apply. (Guidelines, § 15064, subd. (b); *National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341, 1354–1357 [84 Cal.Rptr.2d 563].) An agency must necessarily make a policy decision in distinguishing between substantial and insubstantial adverse environmental impacts based, in part, on the setting. (Guidelines, § 15064, subd. (b).) Where the agency determines that a project impact is insignificant, an EIR (or substitute document) need only contain a brief statement addressing the reasons for that conclusion. (Guidelines, § 15128.) However an EIR (or substitute document)

is required to describe feasible mitigation measures that will minimize significant environmental effects identified. (Pub. Resources Code, §§ 21002.1, subd. (a), 21100, subd. (b)(3); Guidelines, § 15126.4, subd. (a)(1).)

Mitigation may consist of a number of measures, including (1) avoiding an impact by "not taking a certain action"; (2) minimizing impacts by "limiting the degree or magnitude of the action"; (3) "[r]ectifying the impact by repairing, rehabilitating, or restoring the impacted environment"; (4) "[r]educing or eliminating the impact over time by preservation and maintenance operations during the life of the action"; or (5) "[c]ompensating for the impact by replacing or providing substitute resources or environments." (Guidelines, § 15370.)

■■■ Here, the supplemental environmental assessment functioned as a mitigated negative declaration rather than an EIR. Under CEQA, if the agency's study of the project identifies potentially significant effects on the environment but revisions in the project plans "would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur" and there is "no substantial evidence . . . that the project, as revised, may have a significant effect on the environment," a mitigated negative declaration may be used. (Pub. Resources Code, § 21064.5.) " 'A Mitigated Negative Declaration is not intended to be a new kind of document. . . . [¶] [It] provides efficiencies in the process where the applicant can modify his project to avoid all potential significant effects.' " (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 390 [83 Cal.Rptr.2d 836].)

■■■ " 'Mitigated negative declaration' means a negative declaration prepared for a project when the initial study has identified potentially significant effects on the environment, but (1) revisions in the project plans or proposals made by, or agreed to by, the applicant before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment." (Pub. Resources Code, § 21064.5) Upon the issuance of a mitigated negative declaration, " 'the project opponent must demonstrate by substantial evidence that the proposed mitigation measures are inadequate and that the project as revised and/or mitigated may have a significant adverse effect on the environment.' " (*Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1112 [19 Cal.Rptr.3d 469].)

█ Here, the first draft of Rule 1143 identified the fire hazard risks associated with the substitution of acetone for VOC's in paint thinner and multipurpose solvents, but the trial court found it was inadequate because no fire prevention authorities had weighed in on the subject, and it could therefore not evaluate the extent of the hazard. As a result of *Barr I*, the District adopted the measures designed to inform the public of the change in formulation of the products at issue with the belief that such information would alert the public to the increased fire hazard. The District assumed, as a worst case scenario, that limitations on VOC's would result in the substitution of the non-ozone-producing solvent acetone in paint thinners and multipurpose solvents. As acetone is highly flammable at room temperature, this substitution required that consumers be made aware of the new formulation in order that consumers could handle the product in a manner consistent with the hazards presented. As acetone is a common household product, found in everyday items such as nail polish remover, the District could reasonably assume that no more than an alert was required to ameliorate the potential fire hazard. The three measures adopted as part of amended Rule 1143 serve the function of making the public aware of the reformulation of products.[20] Thus, we agree with the trial court's determination that the District's finding of no significant impact upon the environment as a result of Rule 1143's implementation is supported by substantial evidence. Once the District found the potential fire hazard could be avoided or substantially lessened by mitigation measures, it was not required to make any findings regarding the feasibility of proposed alternatives. (*Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 379 [7 Cal.Rptr.2d 307].)

## DISPOSITION

The judgment is affirmed. Respondent is to recover costs on appeal.

Mallano, P. J., concurred.

**CHANEY, J.,** Concurring.—I join in part III of the Discussion portion of the majority opinion and concur with the conclusions reached in parts I and II but not the reasoning behind them.

---

[20] The District contends the hang tag feature, generic component requirement, and outreach programs are not mitigation measures but design features, the difference between the two being the timing—a design feature is part of the project, while mitigation measures are adopted after environmental impacts are identified in design features. (See, e.g., *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 487–490 [14 Cal.Rptr.3d 308].) This distinction is academic here because the procedural history of this case demonstrates the hangtag, outreach, and generic formulation requirement were not initial design features, but adopted in response to the trial court's finding in *Barr I* that the District's analysis of the fire hazard was inadequate.

By 2009, both the South Coast Air Quality Management District (AQMD) and California's State Air Resources Board (CARB) were in the process of formulating regulations to reduce ozone-causing emissions by limiting the amount of volatile organic compounds in paint thinners and multipurpose solvents.[1]

On March 6, 2009, the AQMD adopted "Rule 1143," which required manufacturers of paint thinners and multipurpose solvents to limit the amount of volatile organic compounds in those products to 300 grams per liter by January 1, 2010, and 25 grams per liter by January 1, 2011.[2] The primary way to achieve these limits is to replace volatile organic compounds with acetone.

As required by the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.), the AQMD prepared and certified an environmental assessment before adopting Rule 1143, in which it considered, among other things, the increased risk of fire posed if manufacturers were to begin replacing volatile organic compounds in solvents and thinners with compounds that posed a greater risk of fire. (Acetone has a low flashpoint, meaning it catches fire easily.)[3] The environmental assessment concluded that the increased fire risk resulting from implementation of Rule 1143 would be insignificant. However, at a public hearing held by the AQMD's governing board, Chief Steve Bunting of the Newport Beach Fire Department commented that the flashpoint of acetone was "a big red flag" for fire department personnel. (Postadoption, this concern was echoed by the Office of the State Fire Marshall.) The governing board nevertheless approved the AQMD's environmental assessment and adopted Rule 1143.

On April 1, 2009, appellant W.M. Barr & Company, Inc., a manufacturer of thinners and solvents, filed a CEQA lawsuit against the AQMD, alleging the AQMD's environmental assessment did not adequately address the increased fire risk posed by acetone.

While the lawsuit was pending, AQMD staff met with the State Fire Marshal's office, local fire officials, and CARB staff to address concerns regarding the fire risks posed by use of acetone in thinners and solvents. The fire officials were not concerned about use of acetone per se, as some solvents and thinners already contain acetone or other flammable materials. But those

---

[1] A multipurpose solvent is a chemical used to clean grease and oil from machinery and tools.

[2] Rule 1143 contained a one-year sell-through period, during which noncompliant products could be sold for up to one year beyond the effective date of each limit.

[3] Contrary to common perception, the volatile organic compounds in paint thinner and multipurpose solvents do not catch fire easily.

are sold under names that reflect their primary components—for example "Klean Strip Acetone," "Klean Strip Toluene," and "Klean Strip Xylene." The fire officials were concerned that the principal display panels on products sold under general names such as "paint thinner," "multi-purpose solvent," "clean-up solvent," or "paint clean-up" would not reflect the increased fire risk presented by products reformulated to comply with Rule 1143.[4] The fire officials were concerned that when those products were reformulated to contain acetone, the display panels would remain unchanged, and consumers accustomed to using the products would not bother to read new warning labels on the back of the container.

In light of this concern, the AQMD and CARB worked with the fire marshal's office and Chief Bunting to develop additional labeling requirements for solvent and thinner products with general names.

Meanwhile, the trial court found the AQMD's environmental assessment failed adequately to address the potential increased fire hazard presented by substitution of acetone for mineral spirits in paint thinner. On April 1, 2010, the court ordered the AQMD to rescind Rule 1143's 25 grams per liter limit pending further CEQA review. The court left in place the interim 300 grams per liter limit.

The AQMD rescinded the 25 grams per liter limit in Rule 1143 on June 4, 2010, then readopted it on July 9, 2010, with a new warning label requirement. It also filed a supplemental environmental assessment. The new label requirement was actually a prohibition: No "flammable" or "extremely flammable" thinner or multipurpose solvent could be sold if the name on the principal display panel was generic, i.e., "paint thinner," "multi-purpose solvent," "clean-up solvent," or "paint clean-up." This prohibition did not apply to any product that included on the principal display panel, in a font size as large as, or larger than, the largest font size of any other words on the panel, the common name of the chemical compound that renders the product flammable, e.g., "acetone" or "methyl acetate." The prohibition also did not apply where a "hang tag" or sticker attached to the container displayed either of the following statements: "Formulated to meet low VOC limits: see warning label" or "Formulated to meet low VOC limits with [Acetone, Methyl Acetate, etc.]" Alternatively, a manufacturer would be permitted to label its product generically if the above language was included on the principal display panel in a font size as large as, or larger than, the largest font size of the generic name. Finally, products that otherwise met CARB labeling requirements specified in title 17 of the California Code of

---

[4] Examples of such products are "Klean Strip Paint Thinner," "Klean Strip Paint Clean-Up," and "Recochem Solvent."

Regulations, section 94512, subdivision (e), were exempt from the prohibition against generic labeling.[5]

CARB staff, Chief Bunting, and State Fire Marshal staff all agreed these new warning requirements reduced the risk of acetone-related injuries to insignificance.

In August 2010, one month after the AQMD readopted Rule 1143, CARB adopted its own solvent and thinner regulations. Under CARB's regulations, manufacturers of paint thinners and multipurpose solvents were required to limit the amount of volatile organic compounds in those products to 30 percent by weight by December 31, 2010, and 3 percent by weight by December 1, 2013. (Cal. Code Regs., tit. 17, § 94509.)[6] The CARB labeling requirements were similar to the AQMD's requirements: A thinner or solvent could not be designated generically as "paint thinner" or "multipurpose solvent" on the principal display panel unless the label or an attached hang tag stated the product was reformulated to meet VOC limits or the principal display panel "display[ed], in both English and Spanish and a font size as large as, or larger than, the font size of all other words on the panel, the common name of the chemical compound (e.g., 'Acetone,' 'Methyl acetate,' etc.)" that renders the product flammable. (Cal. Code Regs., tit. 17, § 94512, subd. (e).)

On July 15, 2010, Barr filed a second lawsuit challenging Rule 1143 as amended. It alleged the AQMD's supplemental environmental assessment was inadequate because the fire hazards presented by Rule 1143 were

---

[5] Subdivision (e) of California Code of Regulations, title 17, section 94512 provides, in pertinent part:

"(1) [E]ffective December 31, 2010, until December 31, 2015, no person shall sell, supply, offer for sale, or manufacture for use in California any 'Flammable' or 'Extremely Flammable' Multi-purpose Solvent or Paint Thinner named, on the Principle Display Panel as 'Paint Thinner,' 'Multi-purpose Solvent,' 'Clean-up Solvent,' or 'Paint Clean-up.'

"(2) Section 94512(e)(1) does not apply to products that meet either of the following criteria:

"(A) Products which include an attached 'hang tag,' sticker, or contrasting square or rectangular area on the Principle Display Panel that displays, at a minimum, the following statements in a font size as large as, or larger than, the 'signal word' (i.e., 'DANGER,' 'WARNING,' or 'CAUTION') as specified in title 16, Code of Federal Regulations, section 1500.121:

" 'Formulated to meet California VOC limits; see warnings on label; Vea las advertencias en la etiqueta, formulado complacientes con leyes de California' or

"(B) Products where the Principle Display Panel displays, in both English and Spanish and a font size as large as, or larger than, the font size of all other words on the panel, the common name of the chemical compound (e.g., 'Acetone,' 'Methyl acetate,' etc.) that results in the product meeting the criteria for 'Flammable' or 'Extremely Flammable.' "

[6] Although CARB's and the AQMD's limits are expressed in different types of measurement, the AQMD represents they are equivalent.

mitigated only by new labeling requirements that were themselves preempted by the Federal Hazardous Substances Act (FHSA). It also alleged Rule 1143's volatile organic compound limits were preempted by CARB's pre-2009 consumer product regulations pertaining to general purpose cleaners.

After a hearing, the trial court denied Barr's petition. It found substantial evidence supported the AQMD's conclusion that Rule 1143 would not result in significant fire hazard impacts, Rule 1143 was not preempted by federal or state law, and the AQMD's supplemental environmental assessment was adequate.

### A. *Federal Preemption*

The majority concludes the Rule 1143 labeling requirements are not preempted by the FHSA because they do not require manufacturers to add language to a product label that varies from language prescribed by the FHSA. I agree Rule 1143 is not preempted by the FHSA, but for different reasons.

The FHSA prohibits "introduction or delivery for introduction into inter-state commerce of any misbranded hazardous substance." (15 U.S.C. 1263(a).) A "misbranded hazardous substance" is any hazardous substance that fails to bear a label stating, prominently and in conspicuous and legible type: (1) the name and place of business of the manufacturer; (2) the common or usual name or the chemical name of the hazardous substance; (3) the signal word "DANGER" on substances that are extremely flammable; (4) the signal word "WARNING" or "CAUTION" on all other hazardous substances; (5) an affirmative statement of the principal hazard, such as "Flammable," "Combustible," "Vapor Harmful," "Causes Burns," "Absorbed Through Skin," or similar "wording descriptive of the hazard"; (6) precautionary measures describing the action to be followed or avoided; (7) instruction, when necessary or appropriate, for first-aid treatment; (8) instructions for handling and storage of packages that require special care in handling or storage; and (9) the statement "Keep out of the reach of children" or its equivalent. (15 U.S.C. 1261(p).)[7]

---

[7] 15 U.S.C. 1261(p) provides in pertinent part: "The term 'misbranded hazardous substance' means a hazardous substance . . . intended . . . for use in the household . . . if such substance . . . fails to bear a label [¶] "(1) which states conspicuously (A) the name and place of business of the manufacturer, packer, distributor or seller; (B) the common or usual name or the chemical name (if there be no common or usual name) of the hazardous substance or of each component which contributes substantially to its hazard, unless the Commission by regulation permits or requires the use of a recognized generic name; (C) the signal word 'DANGER' on substances which are extremely flammable, corrosive, or highly toxic; (D) the signal word 'WARNING' or 'CAUTION' on all other hazardous substances; (E) an affirmative statement of the principal hazard or hazards, such as 'Flammable,' 'Combustible,' 'Vapor

This labeling requirement preempts any nonidentical state cautionary labeling requirement "designed to protect against the same risk of . . . injury." (15 U.S.C. 1261, note (b)(1)(A).) Thus, if a state regulation mandates a label that is more elaborate than or different from the one required by the FHSA and its regulations, the state regulation is preempted. (*Moss v. Parks Corp.* (4th Cir. 1993) 985 F.2d 736, 740.)

No conflict exists between the FHSA and Rule 1143.

Rule 1143 can be satisfied several different ways. Most easily, a manufacturer could discontinue its practice of generically naming its products. Nothing in the FHSA requires that manufacturers be permitted to give generic names to hazardous products. Alternatively, a manufacturer could satisfy Rule 1143 by putting the common name of a product's chief hazardous chemical (e.g., "acetone" or "ethyl acetate") on the container's principal display panel in a font as large as that of the generic product name. This requirement is substantially identical to that imposed by 15 U.S.C. 1261, which requires that the label set forth the common or usual name of the product's hazardous substance.

A manufacturer could also satisfy Rule 1143 by putting the following language on the container's primary display panel or on an attached sticker or hang tag: "Formulated to meet low VOC limits; see warnings on label." The first clause ("formulated to meet low VOC limits") satisfies the FHSA's requirement that the label bear "wording descriptive of the hazard." The second clause ("see warnings on label") does no more than direct the user to the warning label, and is thus permissible either as a handling instruction or as an extension of the FHSA-regulated warning label.

Barr contends this language is preempted by the FHSA because it is not identical to warning language the act specifically prescribes. The argument is without merit because the FHSA prescribes *no* specific language for flammable products other than the words "warning" or "caution." The FHSA permits any other "wording descriptive of the hazard," any language setting forth instructions for handling, storage and first aid treatment and precautionary measures to be followed or avoided, and any language equivalent to the

---

Harmful,' 'Causes Burns,' 'Absorbed Through Skin,' or similar wording descriptive of the hazard; (F) precautionary measures describing the action to be followed or avoided . . . ; (G) instruction, when necessary or appropriate, for first-aid treatment; (H) the word 'poison' for any hazardous substance which is defined as 'highly toxic' by subsection (h); (I) instructions for handling and storage of packages which require special care in handling or storage; and (J) the statement (i) 'Keep out of the reach of children' or its practical equivalent . . . , and [¶] "(2) on which any statements required under subparagraph (1) of this paragraph are located prominently and are in the English language in conspicuous and legible type in contrast by typography, layout, or color with other printed matter on the label."

statement " '[k]eep out of the reach of children.' " (15 U.S.C. § 1261(p).) (See *People ex rel. Lungren v. Cotter & Co.* (1997) 53 Cal.App.4th 1373, 1385–1386 [62 Cal.Rptr.2d 368] [FHSA sets forth only a general duty to inform users and purchasers of potentially dangerous items].)

In short, the FHSA does not preempt Rule 1143 simply because no conflict between the two exists.

### B. *State Preemption—Regulation of General Purpose Cleaners*

Neither is Rule 1143 preempted by CARB's regulations pertaining to general purpose cleaners. Barr argues Rule 1143's definition of paint thinners is so broad that it could include general purpose cleaners as defined by CARB in California Code of Regulations, title 17, section 94508. It argues any regulation of paint thinners by the AQMD would thus be preempted by CARB's general purpose cleaner regulations, which were adopted in 1994. The argument is without merit.

CARB defines 159 consumer products in California Code of Regulations, title 17, section 94508. Some of the products are identified by their chemical compositions.[8] Others are defined by their uses. For example, "paint thinner" is defined as "any liquid product used for reducing the viscosity of coating compositions or components . . . ." (Cal. Code Regs., tit. 17, § 94508, subd. (a)(113).) Yet other products are categorized by their labeling. "General purpose cleaner" is defined as "a product labeled to clean a variety of hard surfaces. 'General Purpose Cleaner' includes, but is not limited to, products designed or labeled for general floor cleaning, kitchen, countertop, or sink cleaning, and cleaners designed or labeled to be used on a variety of hard surfaces such as stovetops, cooktops, or microwaves.' " (*Id.*, subd. (a)(70).) "Multi-purpose solvent" is defined as "any liquid product designed or labeled to be used for dispersing, dissolving, or removing contaminants or other organic materials." (*Id.*, at subd. (a)(104)(B).)

Regulations for consumer products defined in California Code of Regulations, title 17, section 94508 are set forth in California Code of Regulations, title 17, section 94509.

Barr finds identity between paint thinners and general purpose cleaners by way of an inference it draws from the different way Rule 1143 treats paint

---

[8] For example, "Alkylphenol Ethoxylate" is defined as "a nonionic surface active agent (surfactant) compound composed of an alkyl chain that contains at least eight carbon atoms and a polyethoxylate chain attached to a benzene ring." (Cal. Code Regs., tit. 17, § 94508, subd. (a)(8).)

thinners and multipurpose solvents. Rule 1143 defines "consumer multi-purpose solvents" in pertinent part as "any liquid products designed or labeled to be used for dispersing or dissolving or removing contaminants or other organic materials for personal, family, household, or institutional use . . . . [¶] . . . 'Multi-purpose Solvents' . . . *do not include any products making any representation that the product may be used as, or is suitable for use as a consumer product which qualifies under another definition in California Code of Regulations Title 17, § 94508 . . . .*" (Italics added.) Rule 1143 defines "consumer paint thinners" in pertinent part as "any liquid products used for reducing the viscosity of coating compositions or compo-nents for personal, family, household, or institutional use . . . ." Barr argues that whereas Rule 1143 expressly excludes from its definition of multipurpose solvent any contaminant-dissolving liquid that is labeled as also having other uses, it contains no similar limitation regarding paint thinners. Absence of such a limitation can only mean the AQMD intended to embrace other consumer products within the definition of paint thinners. Barr does not expressly identify on appeal what other product from the California Code of Regulations, title 17, section 94508 list would be suitable for reducing paint viscosity and also qualify as a general purpose cleaner, but suggested below that its "Klean-Strip Methyl Ethyl Ketone" and "Klene Strip Xylol Xylene" "could" fit the bill.

I am not persuaded Barr has drawn a valid inference from Rule 1143's disparate treatment of thinners and solvents or, even if it has, that the inference supports its argument that the AQMD's paint thinner regulations are preempted by CARB's general purpose cleaner regulations.

AQMD could have had several reasons for treating thinners and solvents differently. Rule 1143 defines multipurpose solvent in terms of its design and label, while paint thinner is defined in terms only of its use. Whether or not this distinction makes any practical difference, it at least furnishes a reason-able basis for the AQMD's refusal to add a label-based limitation to its paint thinner definition. AQMD could also have opted not to issue a label-based exemption for thinners for the reason it gives on appeal: If it did so, manufacturers could evade the regulations simply by relabeling their thinners. More substantively, the AQMD may have concluded that the danger of adopting overbroad regulations required it to insert limiting language as to multipurpose solvents, a relatively broad class of products, but not to paint thinners, a relatively narrower class. In any event, nothing in the record compels the conclusion that the AQMD intended to regulate nonthinners.

At any rate, Barr fails to identify any particular product that would fall under Rule 1143's definition of paint thinners and also be regulated as a general purpose cleaner. Barr suggested below that its Klean-Strip Methyl

Ethyl Ketone and Klene Strip Xylol Xylene "could" qualify as both thinners and multipurpose cleaners, but it does not attempt to support the suggestion on appeal. Neither does it identify any actual conflict between Rule 1143 and preexisting CARB standards.

I would conclude based on the lack of an actual conflict between Rule 1143 and the general purpose cleaner regulation set forth in California Code of Regulations, title 17, section 94509 that the latter does not preempt the former.

### C. *State Preemption—CARB's Regulation of Thinners and Solvents*

The majority reaches the same result by concluding that first-adopted regional regulations preempt later-adopted state regulations. The conclusion is unnecessary because Barr does not contend otherwise. Barr contends only that *preexisting* CARB regulations—those pertaining to general purpose cleaners—preempt Rule 1143. As I discuss above, they do not.

Even had the parties engaged the issue, I would conclude that portions of Rule 1143 *are* preempted by the CARB regulations pertaining to thinners and multipurpose solvents.

First, an actual conflict exists between the two sets of regulations. Although the volatile organic compound limits for thinners and solvents they set forth are essentially the same, CARB's final limit does not go into effect until December 31, 2013, three years later than Rule 1143's final limit, and CARB's rule contains a three-year sell-through period, compared with the one-year sell-through period permitted by Rule 1143. Second, specifically under subdivision (f) of Health and Safety Code section 41712 and also under well-settled law, CARB's regulations preempt contrary regulations set forth in Rule 1143. (See *Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897 [16 Cal.Rptr.2d 215, 844 P.2d 534] [" 'If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void.' [Citations.]"].)

The majority's contrary conclusion, that the CARB regulation is preempted by Rule 1143, is based on a reading of subdivision (f) of Health and Safety Code section 41712 (section 41712), which provides: "A district shall adopt no regulation pertaining to disinfectants, nor any regulation pertaining to a consumer product that is different than any regulation adopted by the state

board for that purpose." AQMD argues this language refers only to regulations *already adopted* by CARB, because otherwise the Legislature would have stated that a district shall not "adopt *or enforce*" regulations that conflict with state regulations.

This reading is reasonable but not compelling, and it would contravene precedent, thwart regulatory uniformity, and upend the primacy given by the Legislature to CARB. A point in favor of the reading is that the statutory language does say a district may not "adopt" a rule different from the board's rule. It does not say the district may not "adopt or continue in effect" or "adopt or enforce." (See, e.g., 15 U.S.C.A. (2008) foll. § 1261, Notes, Effect Upon Federal and State Law (b)(1)(A); Health & Saf. Code, § 41712, subd. (i)(1).)

The point against the majority's conclusion is that it would lead to a patchwork of regulations based on which agency adopts a particular regulation first. In California there are five air quality management districts and dozens of air pollution control districts, one for each county not already included in an air quality management district. (Health & Saf. Code, §§ 40002, 40100, 40200, 40410, 40960, 41210, 41300.) The word "district" in section 41712 refers to any of these. (Health & Saf. Code, § 39025.) Under AQMD's construction of section 41712, a nationwide manufacturer would have to navigate not only 51 sets of regulations for a particular product (one for each state plus the federal regulations), but also the regulations of dozens of air pollution control districts in California alone, and it would have to know when each district's regulation was adopted so it could determine whether the district's or state's regulations controlled. This, I submit, is an undesirable result.

The Legislature sometimes agrees. In subdivision (i)(1) of Health and Safety Code section 41712 the Legislature stated its intent was "that air pollution control standards affecting the formulation of aerosol paints and limiting the emissions of volatile organic compounds resulting from the use of aerosol paints be set solely by the state board to ensure uniform standards applicable on a statewide basis." (*Ibid.*) Although this statement of intent expressly pertains only to volatile organic compounds emitted from aerosol paints, I would be chary to conclude the Legislature intended that regulation of the same compounds emitted from other sources not be uniform. On the other hand, this is exactly the case with aerosol adhesives, as to which the Legislature has specifically stated that districts are free to issue regulations setting standards for volatile organic compound emissions that are more

stringent than state standards. (*Id.*, subd. (h)(3).) But the Legislature has never affirmatively stated that district regulations should preempt state regulations simply because they were adopted first.

I therefore agree with the court's judgment but cannot agree with its reasoning.